# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

LYTTON RANCHERIA OF CALIFORNIA,

    1500 Falling Oak Way
    Windsor, CA 95492;

DRY CREEK RANCHERIA BAND OF POMO
INDIANS,

    1450 Airport Blvd., Suite 200A
    Santa Rosa, CA 95403; and

CLOVERDALE RANCHERIA OF POMO
INDIANS,

    555 S. Cloverdale Boulevard, Suite A
    Cloverdale, CA 95425;

        *Plaintiffs*,

    v.

UNITED STATES DEPARTMENT OF THE
INTERIOR,

    1849 C Street, NW
    Washington, DC 20240;

UNITED STATES BUREAU OF INDIAN
AFFAIRS,

    1849 C Street, NW
    Washington, DC 20240;

DOUGLAS J. BURGUM, in his official capacity as
Secretary of the U.S. Department of the Interior,

    1849 C Street, NW
    Washington, DC 20240;

BRYAN MERCIER, in his official capacity as acting
Assistant Secretary for Indian Affairs, U.S.
Department of the Interior,

    1849 C Street, NW
    Washington, DC 20240;

STEPHANIE CONDUFF, in her official capacity as
acting Director of the U.S. Bureau of Indian Affairs,

Civil Action No.

**COMPLAINT**

1849 C Street, NW
Washington, DC 20240;

AMY DUTSCHKE, in her official capacity as
Regional Director, Pacific Region, of the U.S. Bureau
of Indian Affairs,

2800 Cottage Way, Ste. W-2820
Sacramento, CA 95825;

PHILIP BRISTOL, in his official capacity as Acting
Director of the Office of Indian Gaming, U.S.
Department of the Interior,

1849 C Street, NW
Washington, DC 20240;

TONY DEARMAN, in his official capacity as
Director of the U.S. Bureau of Indian Education,

1849 C Street, NW
Washington, DC 20240;

*Defendants*.

Plaintiffs Lytton Rancheria of California ("Lytton"), the Dry Creek Rancheria Band of Pomo Indians, California ("Dry Creek"), and the Cloverdale Rancheria of Pomo Indians of California ("Cloverdale", and together with Lytton and Dry Creek, "Plaintiffs"), by this Complaint, allege as follows:

## INTRODUCTION

1.    This action seeks to remedy the unlawful actions of the U.S. Department of the Interior ("DOI"), Bureau of Indian Affairs ("BIA"), and their officers in rushing to take land into trust and to approve a casino project proposed by the Koi Nation of Northern California ("Koi")—all of which irreparably harm Plaintiffs.

2.    This casino project is one of several gaming projects that—by their own admission—Defendants (as defined below) hurried to approve before the end of the Biden administration. Indeed, when opposing a temporary restraining order regarding the same gaming

project at issue in this case, Defendants' attorney argued that an early hearing was necessary because "[DOI] **wants to take the land into trust before the next administration**."[1] And the ultimate approval transferring land for the casino project was issued just days before the end of the Biden administration by a Bureau of Indian Education official who previously had no involvement whatsoever in the approval process. In rushing through these approvals, Defendants railroaded other Indian tribes, including Plaintiffs, by ignoring their ancestral connections to the land, failing to conduct necessary consultations, treating Koi preferentially compared to other similarly-situated tribes, and conducting a woefully inadequate environmental survey.

3.      Defendants' actions depart from decades of precedent and practice that carefully scrutinized the connections between Indian tribes and the land upon which they wished to build gaming facilities. The effects of Defendants' actions will be enormous: they set a precedent for green-lighting casinos in virtually any location throughout the United States, no matter how tenuous an Indian Tribe's connection to the proposed casino site may be. And, upon information and belief, that was the point of the final agency decision to approve the Koi application. In fact, Bryan Newland, the Assistant Secretary for Indian Affairs at the time of the relevant approvals, is a former attorney for Koi[2] who, during his tenure at BIA, significantly broadened BIA's interpretation and implementation of statutes and regulations governing Indian gaming facilities in a manner that facilitated approval of Koi's and other tribes' applications.

4.      The Plaintiffs in this case are Southern Pomo Indian tribes with strong historical

---

[1]      *See* Transcript of Proceedings, ECF No. 40-1, *Federated Indians of Graton Rancheria v. Haaland*, No. 3:24-cv-08582-RFL (Dec. 20, 2024) at 12:6-13 (emphasis added).

[2]      *See, e.g.*, Phil Barber, *Newsom's Office Urges Department of Interior to Reject Koi Casino Near Windsor*, The Press Democrat (Aug. 21, 2024), *available at* https://www.pressdemocrat.com/article/ news/koi-casino-newsom-greg-sarris/. Mr. Newland's former law partner continues to represent Koi.

connections to Sonoma County, California. That history began before European contact centuries ago, and continues to the present. For instance, Lytton's federally-recognized homeland is located in the town of Windsor in Sonoma County. Similarly, both Cloverdale's and Dry Creek's members and their ancestors have occupied and subsisted on resources found in Windsor and Sonoma County, beginning thousands of years ago.

5.    In contrast, Koi (which was known as the Lower Lake Rancheria before 2022) is a tribe of Southeastern Pomo people who are linguistically and culturally distinct from Plaintiffs and other Southern Pomo Indian tribes, and whose ancestral homeland is located near Clear Lake in Lake County, California—about fifty (50) miles away.

6.    Though it lacks any significant historical connection to the area, Koi plans to build a casino gaming project (the "Project") on a 68.6-acre site near Windsor in Sonoma County, California (the "Project Site"). To that end, Koi requested that BIA acquire the Project Site into federal trust status for the benefit of Koi, and in addition that BIA and other federal agencies approve Koi's construction of the Project. The approvals include (a) a fee-to-trust transfer pursuant the Indian Reorganization Act, Indian Gaming Regulatory Act, and related regulations; and (b) environmental and historical approvals of the Project under the National Environmental Policy Act and National Historic Preservation Act. In November 2024, BIA issued a final Environmental Impact Statement ("FEIS") for the Project, and on January 13, 2025, both an Indian Lands Opinion approving the fee-to-trust transfer (the "Koi ILO") and the record of decision ("ROD") for that transfer were issued.

7.    Those administrative actions were critically flawed, both procedurally and substantively. In particular:

        a.    Koi sought and obtained approval of the Project and the fee-to-trust transfer

under the so-called "restored lands" exception of the Indian Gaming Regulatory Act. But for that exception to apply, Koi must have a "significant historical connection" to the Project Site (25 C.F.R. § 292.12(b))—and no such connection exists.

b.    Koi's applications were approved by the Director of Bureau of Indian Education, who was not authorized by governing regulations to take action on the trust request.

c.    When approving the Project under the National Environmental Policy Act, Defendants relied upon regulations promulgated by the Council of Environmental Quality, but those regulations are *ultra vires* and unconstitutional.

d.    Defendants failed to consult affected tribes regarding the Project, and failed to provide public comment periods commensurate with the length and complexity of the materials released for the Project, in violation of relevant law, including (but not limited to) the National Historic Resources Protection Act and National Environmental Policy Act.

e.    The Environmental Impact Statement issued by Defendants failed to adequately respond to and consider comments from Plaintiffs regarding various significant impacts.

f.    In approving the Project, Defendants provided Koi with preferential treatment relative to Plaintiffs, in violation of the Privileges and Immunities Clause of the Indian Reorganization Act and the federal Administrative Procedure Act.

8.    Accordingly, by this action, Plaintiffs seek (a) a determination that the ROD, Koi ILO, and Final EIS are void and invalid, and thus the fee-to-trust transfer was never effectuated; (b) alternatively, that the Court order a reversal of the fee-to-trust transfer until such time, as any, that Defendants fully comply with law; and (c) the additional relief described below.

## PARTIES

9.     Plaintiffs Lytton, Cloverdale, and Dry Creek are federally-recognized American Indian tribes, among 574 tribes recognized by BIA. Plaintiffs are Southern Pomo tribes with aboriginal origins and current tribal homelands in Sonoma County.

10.     Defendant DOI is the federal agency statutorily charged with the primary administration of the federal government's trust responsibility to Indian tribes. *See* 25 U.S.C. §§ 2, 9.

11.     Defendant BIA is a federal agency within DOI responsible for delivery of program services to the federally recognized tribes and individual Indians, whether directly or through contracts, grants, or compacts. BIA is responsible for evaluating land-to-trust applications, conducting relevant tribal consultations under applicable laws, conducting environmental reviews, and effectuating acquisitions into trusts. BIA's program services are administered through various regional offices and agencies across the United States.

12.     Defendant Douglas J. Burgum is the U.S. Secretary of the Interior (the "Secretary") and is sued in his official capacity. The Secretary is responsible for overseeing the implementation of "undertakings" within the DOI and its agencies, including BIA, as well as DOI's implementation and compliance with applicable laws. Between 2021 and January 2025, the position of Secretary was held by Deb Haaland.

13.     Plaintiffs are informed and believe, and on that basis allege, that Defendant Bryan Mercier is the acting Assistant U.S. Secretary for Indian Affairs ("Assistant Secretary"), and he is sued in his official capacity. The Assistant Secretary discharges the duties of the Secretary, including by, *inter alia*, exercising discretion and leadership over BIA and deciding requests for fee-to-trust acquisitions. The Office of the Assistant Secretary includes the Principal Deputy

Assistant Secretary – Indian Affairs ("PDAS-IA"). Between 2021 and January 2025, Bryan Newland held the position of Assistant Secretary, and between 2021 and 2024, Wizipan Little Elk Garriott held the position of PDAS-IA.

14.    Defendant Stephanie Conduff is the acting Director of BIA ("BIA Director") and is sued in her official capacity. The BIA Director is responsible for overseeing BIA's implementation of relevant laws, including the land-to-trust acquisition and environmental review process for gaming projects on reservation sites.

15.    Defendant Amy Dutschke is the Regional Director of the Pacific Region of BIA ("Regional Director"), located in Sacramento, California, and is sued in her official capacity. The Regional Director is responsible for complying with DOI and BIA policy and procedures for fee-to-trust acquisitions, including records management and related responsibilities and processing discretionary off-reservation land-to-trust applications.

16.    Plaintiffs are informed and believe, and on that basis allege, that Defendant Philip Bristol is the acting Director of the Indian Affairs Office of Indian Gaming ("Gaming Director"), and he is sued in his official capacity. The Gaming Director is responsible for overseeing the development of policies and procedures used to implement the Secretary's responsibilities relating to land acquisition requests from federally recognized tribes for gaming purposes, tribal-state gaming compacts, tribal gaming per capita distribution plans, and gaming-related contracts. Between 2010 and January 2025, the position of Gaming Director was held by Paula Hart.

17.    Defendant Tony Dearman is the Director of the Bureau of Indian Education ("BIE Director") and is sued in his official capacity. The BIE Director is responsible for implementing federal Indian education programs, but has no responsibility or involvement with respect to approvals of fee-to-trust transfers or gaming approvals. However, the BIE Director, purporting to

act pursuant to delegated authority, signed the Koi ILO.

18.     The DOI, BIA, Secretary, Assistant Secretary, BIA Director, Regional Director, Gaming Director, and BIE Director are collectively referred to herein as "Defendants." All of these Defendants worked in concert with each other, and as agents of the other Defendants, in connection with the unlawful approvals issued for the Project, and thus all such violations are attributable to all Defendants.

## JURISDICTION AND VENUE

19.     This Court has subject-matter jurisdiction over this action pursuant to 5 U.S.C. §§ 701-06, 28 U.S.C. § 1331, 28 U.S.C. § 1346, and 28 U.S.C. § 1362.

20.     Venue is proper in this judicial district under 28 U.S.C. § 1391(e) because officers of the United States are named as Defendants in their official capacities and reside in this judicial district, and a substantial part of the events or omissions giving rise to the claims occurred in this district due to decisions made here by Defendants.

## STATUTORY AND REGULATORY BACKGROUND

### A.     The Indian Reorganization Act

21.     The Indian Reorganization Act ("IRA") permits the Secretary, "in his discretion," to take land into trust on behalf of an Indian Tribe "for the purpose of providing land for Indians." 25 U.S.C. § 5108.

22.     The regulations at 25 C.F.R. Part 151 ("Part 151") "set[] forth the authorities, policies, and procedures governing the acquisition of land by the United States in trust status for . . . Tribes." 25 C.F.R. § 151.1. Under Part 151, as effective at the time of Koi's application, the Secretary must consider a number of factors when reviewing an application to acquire land in trust when the land is located outside of and non-contiguous to a tribe's reservation, including (in

relevant part) the existence of "statutory authority for the acquisition" and any limitations therein, the land's "distance from the boundaries of the tribe's reservation," the "need of the individual Indian . . . tribe for additional land," and "anticipated economic benefits associated with the [land's] proposed use." 25 C.F.R. § 151.11(a)–(c) (1995) (incorporating 25 C.F.R. § 151.10(a)–(b) (1995)).

23.     When the Secretary receives an application from a Tribe to take land into trust pursuant to the IRA, state and local governments having regulatory jurisdiction over that land have an opportunity to provide comment. "[A]s the distance between the tribe's reservation and the land to be acquired increases, the Secretary shall give greater scrutiny to the tribe's justification of anticipated benefits from the acquisition" and "shall give greater weight to the concerns raised" by state and local governments. 25 C.F.R. § 151.11(b) (1995).

24.     The IRA further provides that "[a]ny regulation or administrative decision or determination of a department or agency of the United States that is in existence or effect on May 31, 1994, and that classifies, enhances, or diminishes the privileges and immunities available to a federally recognized Indian tribe relative to the privileges and immunities available to other federally recognized tribes by virtue of their status as Indian tribes shall have no force or effect." This provision, referred to herein as the "IRA Privileges & Immunities Clause," applies not just to regulations and decisions made under the IRA, but to any regulations or decisions made by any U.S. department or agency pursuant to any statutory or regulatory authority.

**B.      The Indian Gaming Regulatory Act**

25.     The Indian Gaming Regulatory Act ("IGRA") generally prohibits gaming on trust lands acquired after 1988, but provides an exception—known as the "restored lands exception"—where such lands are "taken into trust as part of . . . the restoration of lands for an Indian tribe that

is restored to Federal recognition." 28 U.S.C. §§ 2719(a), 2719(b)(1)(B).

26.    Federal regulations promulgated under the IGRA specify that to qualify as restored lands, the relevant Indian tribe must, *inter alia*, "demonstrate a significant historical connection to the [restored] land." 25 C.F.R. § 292.12. For a "significant historical connection" to exist, the land must be "located within the boundaries of the tribe's last reservation under a ratified or unratified treaty, or a tribe can demonstrate by historical documentation the existence of the tribe's villages, burial grounds, occupancy or subsistence use in the vicinity of the land." 25 C.F.R. § 292.2.

27.    Because the restored lands exception "was not intended to give restored tribes an open-ended license to game on newly acquired lands," the Secretary "needs to ensure that tribes do not take advantage of the exception to expand gaming operations unduly and to the detriment of other tribes' gaming operations." *Rancheria v. Jewell*, 776 F.3d 706, 711 (9th Cir. 2015).

### C.    The National Environmental Policy Act

28.    The National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*, makes environmental protection a part of the mandate of every federal agency, to be considered in conjunction with "economic and technical considerations" to "fulfill the social, economic, and other requirements of present and future generations of Americans." 42 U.S.C. § 4332(1).

29.    NEPA requires that federal agencies take a "hard look" at environmental concerns. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). One of NEPA's primary purposes is to ensure that an agency, "in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts." *Id.* at 350.

30.    NEPA also requires "the relevant information [regarding environmental impacts] will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision." *Id.* Public participation under NEPA serves to

improve the agency's process by ensuring that a "larger audience can provide input as necessary to the agency making the relevant decisions." *Department of Transp. v. Public Citizen*, 541 U.S. 752, 758 (2004).

31.     Under NEPA, agencies must fully disclose all potential adverse environmental impacts of their decisions before deciding to proceed, including by providing "a detailed statement by the reasonable official" on:

> (i) reasonably foreseeable environmental effects of the proposed agency action;
>
> (ii) any reasonably foreseeable adverse environmental effects which cannot be avoided should the proposal be implemented;
>
> (iii) a reasonable range of alternatives to the proposed agency action, including an analysis of any negative environmental impacts of not implementing the proposed agency action in the case of a no action alternative, that are technically and economically feasible, and meet the purpose and need of the proposal;
>
> (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity; and
>
> (v) any irreversible and irretrievable commitments of Federal resources which would be involved in the proposed agency action should it be implemented.

42 U.S.C. § 4332(C).

### D.      Regulations Issued by the Council on Environmental Quality

32.     NEPA also created the Council on Environmental Quality ("CEQ") within the Executive Office of the President to advise on environmental issues, including by "develop[ing] and recommend[ing] to the President national policies to foster and promote the improvement of environmental quality to meet the conservation, social, economic, health, and other requirements and goals of the [United States]." 42 U.S.C. §§ 4342, 4344.

33.     In 1970, the President instructed CEQ to "[i]ssue guidelines to Federal agencies for the preparation of" the "detailed statements" NEPA required. Exec. Order No. 11514, § 3(h), 35 Fed. Reg. 4247, 4248 (Mar. 7, 1970). In response, CEQ published a "memorandum" containing "guidelines" for federal agencies considering environmental impact statements. 36 Fed. Reg. 7724,

7724 (Apr. 23, 1971). Then, in 1977, the President issued an executive order instructing CEQ to issue "regulations" and ordering federal agencies to comply with those "regulations" unless doing so would violate federal law. Exec. Order No. 11991, 42 Fed. Reg. 26,967, 26,968 (May 25, 1977).

34.    Thereafter, CEQ issued a series of regulations that purport to "implement the requirements of NEPA." *See generally* 40 C.F.R. § 1500.1 *et seq.* (the "CEQ Regulations").

35.    Among other things, the CEQ Regulations establish levels of and exemptions from NEPA review (40 C.F.R. § 1501.3-.4); a procedure for conducting environmental assessments to determine whether an environmental impact statement is required (*id.* §§ 1501.5-.6); procedures for public and governmental engagement and deadlines (*id.* § 1501.10); requirements for environmental impact statements and comments on the same (*id.* §§ 1502.1-.24, 1503.1-.4); and record, implementation, and compliance procedures (*id.* §§ 1505.2-3, §§ 1507.1-.4).

36.    Neither NEPA nor any other federal statute empowers CEQ to promulgate regulations implementing NEPA.

### E.    The National Historic Preservation Act

37.    The National Historic Preservation Act ("NHPA") implements the U.S. government's policy of cooperating with "States, local governments, Indian tribes," and other individuals to administer and preserve historic property. 54 U.S.C. § 300101. Under the NHPA, historic property includes "any prehistoric or historic district, site, building, structure, or object" that is or could be included on the National Register of Historic Places, including "artifacts, records, and material remains relating to th[at] district, site, building, structure or object." *Id.* § 300308.

38.    Section 106 of the NHPA requires that the DOI or any other "[f]ederal agency having direct or indirect jurisdiction" over an "undertaking"—including any project or activity

requiring "a [f]ederal permit, license, or approval"—must "take into account the effect of the undertaking on any historic property." *Id.* §§ 300320, 306108. The NHPA mandates that, "[i]n carrying out its responsibilities under [Section 106], a [f]ederal agency shall consult with any Indian tribe . . . that attaches religious and cultural significance" to a property. *Id.* § 302706(b).

39.     The NHPA also empowers an Advisory Council on Historic Preservation to, among other things, "promulgate regulations as it considers necessary to govern the implementation of" that mandate. *Id.* §§ 304101, 304108, 306108. In turn, those regulations (the "NHPA Regulations") reiterate that the relevant agency must "consult with any Indian tribe . . . that attaches religious and cultural significance to historic properties that may be affected by an undertaking[,] . . . regardless of the location of the historic property." 36 C.F.R. § 800.2(c)(2)(ii). The NHPA Regulations specify that the consultation must occur "***early in the planning process***, in order to identify and discuss relevant preservation issues and resolve concerns about the confidentiality of information on historic properties." *Id.* § 800.2(c)(2)(ii)(A) (emphasis added); *see also* 36 C.F.R. § 801 (federal agencies' consultation process with interested parties must begin "at the early stages of project planning").

40.     The NHPA Regulations impose a number of additional requirements for consultations with Indian Tribes under Section 106 of the NHPA. For instance:

- "The agency official shall ensure that consultation in the section 106 process provides the Indian tribe . . . a reasonable opportunity to identify its concerns about historic properties, advise on the identification and evaluation of historic properties, including those of traditional religious and cultural importance, articulate its views on the undertaking's effects on such properties, and participate in the resolution of adverse effects." 36 C.F.R. § 800.2(c)(2)(ii)(A).

- That official must "make a reasonable and good faith effort to identify Indian tribes and Native Hawaiian organizations that shall be consulted in the section 106 process." *Id.*

- "Consultation with Indian tribes should be conducted in a sensitive manner

respectful of tribal sovereignty," consistent with the U.S. government's "unique legal relationship with Indian tribes set forth in the Constitution of the United States, treaties, statutes, and court decisions." *Id.* § 800.2(c)(2)(ii)(B).

- "Consultation with Indian tribes . . . should be conducted in a manner sensitive to the concerns and needs of the Indian tribe or Native Hawaiian organization. *Id.* § 800.2(c)(2)(ii)(C).

- "Federal agencies should be aware that frequently historic properties of religious and cultural significance are located on ancestral, aboriginal, or ceded lands of Indian tribes . . . and should consider that when complying with the procedures in this part. § 800.2(c)(2)(ii)(D).

41.     The NHPA Regulations direct that, in order to adhere to the obligations of Section 106, the consultation process should occur as part of, and in conjunction with, the NEPA environmental review. *Id.* § 800.8 ("Federal agencies are encouraged to coordinate compliance with [S]ection 106 and the procedures in this part with any steps taken to meet the requirements of [NEPA]. Agencies should consider their [S]ection 106 responsibilities as early as possible in the NEPA process, and plan their public participation, analysis, and review in such a way that they can meet the purposes and requirements of both statutes in a timely and efficient manner."). The CEQ Regulations also direct that draft environmental impact statements should be prepared "concurrent and integrated with" other surveys and studies applicable to the proposed action, including those required under the NHPA. 40 C.F.R. § 1502.24.

F.     **The Administrative Procedure Act**

42.     Under the APA, this Court must set aside and hold unlawful any agency action that is, among other things, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law"; "in excess of statutory jurisdiction, authority, or limitations . . ."; or "without observance of procedure required by law." 5 U.S.C. § 706(2).

43.     An "[a]gency action is arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider; entirely failed to consider an important aspect of

the problem; offered an explanation for its decision that runs counter to the evidence before it; or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Am. Clinical Laboratory Ass'n v. Becerra*, 40 F.4th 616, 624 (D.C. Cir. 2022) (quoting *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983)) (internal alterations and quotation marks omitted).

## FACTUAL BACKGROUND

### A.     Background on Plaintiffs

*Lytton*

44.    Plaintiff Lytton is a Southern Pomo Indian Tribe with strong connections to Sonoma County, California—beginning before European contact centuries ago and continuing to the present.

45.    Lytton has approximately 270 adult members, and expects its membership to continue to grow through generations.

46.    Lytton is one of several federally-recognized Southern Pomo tribes with an aboriginal connection to Sonoma County. Together with Lytton, these include Dry Creek, Cloverdale, and the Federated Indians of Graton Rancheria, California ("Graton"). The Southern Pomo tribes' aboriginal land is outlined in the below map in blue:[3]

---

[3]    Map adapted from Exhibits to Koi Request for Restored Land Opinion at 503. Graton's historical rancheria—a tract of land purchased by BIA in 1920 and held in federal trust for Graton's members—is designated on the map.



MAP 17. Pomo languages and their major dialects.

47.  In 1926, the U.S. government purchased land for homeless Indians in Sonoma County. This land would become the Lytton Rancheria, where Lytton members would settle and sustain themselves for decades. The location of this original Lytton Rancheria is designated on the map above. In 1961, the United States government illegally and unjustly terminated the reservation and ceased acknowledging Lytton as a federally recognized tribe. However, after a landmark court decision in 1991, the U.S. government reinstated its recognition of Lytton. The conditions of the Stipulated Judgment reinstating Lytton's recognition prohibit Lytton from regaining its original homeland or gaming in Sonoma County.

48.  After regaining tribal recognition, Lytton applied for a restored lands determination in 1999. DOI rejected that application because it had a policy at the time of denying all restored

land petitions unless there was legislation specifying that a tribe was entitled to certain lands.

49.    In 2001, pursuant to special federal legislation, the U.S. acquired a 9.5-acre site in San Pablo, California, to be held in trust for Lytton. Thereafter, Lytton converted an existing card room into a class II gaming facility—the San Pablo Lytton Casino. Lytton did so with the support of the City of San Pablo and the region's Congressional representative. Lytton also entered into multiple agreements with the City regarding this gaming facility, and the San Pablo Lytton Casino provides approximately 60% of the City of San Pablo's operating revenue. Although that site provides critical economic support for Lytton, it was not large enough to constitute a tribal homeland for Lytton, nor was it located in Sonoma County, Lytton's historic homeland.

50.    In 2019, after Lytton was able to acquire property in Sonoma County—near its historic rancheria, and within its aboriginal homeland—Congress directed that a portion of that land should be taken into trust to "ensure that the Lytton Rancheria will finally have a permanently protected homeland on which the Tribe can once again live communally and plan for future generations."[4] This land (the "Lytton Homeland") is designated on the map above.

*Dry Creek*

51.    Plaintiff Dry Creek is a federally recognized Indian tribe whose people have inhabited the areas in and around the Windsor for thousands of years. Dry Creek is comprised of Southern Pomo from the region that includes the proposed Project Site. Dry Creek Rancheria is located a mere nineteen (19) miles from the Project Site.

52.    Dry Creek currently has 1,350 tribal members, and over half of those tribal members live in Sonoma County. Official recognition of Dry Creek as a sovereign nation occurred

---

[4]    National Defense Authorization Act for Fiscal Year 2020, Pub. L. No. 116-92, § 2869, 133 Stat. 1198, 1905-7.

in 1915, when the U.S. federal government created the Dry Creek Rancheria and named Dry Creek the Dry Creek Rancheria Band of Pomo Indians. The rancheria occupies 75 steep acres between Healdsburg and Geyserville off Highway 128—a sliver of Dry Creek's historic land.

53.     The United States purchased the Dry Creek Rancheria pursuant to an Indian Appropriation Act and holds the land in trust for Dry Creek. The rancheria was specifically acquired pursuant to the Indian Appropriation Act of August 1, 1914, which provided "[f]or the purchase of lands for the homeless Indians of California, including improvements thereon, for the use of said Indians . . . ." Pub. L. No. 63-159, 38 Stat. 582, 589.

54.     The rancheria has been developed to include the River Rock Casino and related facilities, including a parking structure and wastewater treatment facility. However, due to a series of political and financial obstacles, Dry Creek has not yet been unable to develop that casino into a permanent facility.

55.     In particular, in September 2002, after Dry Creek constructed and began operating the River Rock Casino in a temporary structure on the rancheria, the Sonoma County Fire Chief began taking actions to inspect and take authority over the casino property based on an interpretation of Dry Creek's gaming compact with the State of California. Dry Creek objected to the fire chief's assertion of authority, and the fire chief applied for a State civil administrative inspection warrant for the rancheria. That dispute ultimately resulted in litigation in the U.S. District Court for the Northern District of California, *Dry Creek Rancheria of Pomo Indians v. Sonoma County Fire Chief* (N.D. Cal. filed Oct. 9, 2002).

56.     One of the main concerns raised by the Fire Chief was the lack of secondary emergency access to the casino. However, Dry Creek had a pending fee-to-trust application to take contiguous lands into trust in order to construct the emergency access road. The  District Court

determined that the county does not have fire code enforcement jurisdiction on the rancheria, and the Ninth Circuit Court of Appeals, in a final judgment, affirmed that decision.

57.    While that litigation was underway, the State of California, Sonoma County, and a local citizen group each appealed BIA's final decision to take 18 acres of land (contiguous to the rancheria) into trust for Dry Creek. To resolve that appeal, Dry Creek was forced to purchase "like-for-like" exchange property to off-set the county's allegation that the trust acquisition violated the Williamson Act. Dry Creek had to purchase property in Petaluma for almost $12.5 million—which was an exorbitant price, as it was only one of few properties available that would meet the criteria for land exchange under the Williamson Act.

58.    Sonoma County also disputed Dry Creek's assessment and mitigation of the off-reservation environmental impacts that might result from a planned permanent casino and hotel facility. The county asserted that there would be significant off-reservation impacts from Dry Creek's existing and planned Rancheria gaming projects.

59.    Ultimately, Sonoma County dropped its remaining claims and disputes regarding the Fire Chief and the fee-to-trust application when it entered into a 2008 Memorandum of Agreement with Dry Creek (the "2008 MOA"). In the 2008 MOA, the County required Dry Creek to pay a $75 million "mitigation fee." But due to the massive amount of debt that resulted from all the legal hurdles created by the County—which was exacerbated by the Great Recession—Dry Creek could not obtain additional funding to build the permanent structure. Further, in 2013, the Federated Indians of Graton Rancheria built a casino that essentially cut off the local gaming market for San Francisco patrons, causing casino revenues to crash by 60-70%.

60.    Despite all of this opposition and hardship, Dry Creek has continued to operate the River Rock Casino, albeit with significantly reduced revenues than it otherwise would have

enjoyed. Dry Creek operates the casino pursuant to a class III gaming compact with the State of California that recognizes the casino's critical role in providing for the needs of Dry Creek's citizens. River Rock Casino currently employs a large percentage of tribal citizens among its work force of 340 employees. Dry Creek is finalizing plans for a permanent casino and hotel to replace the temporary gaming facility that is operated on Dry Creek's Indian lands.

61.    Despite the incredible hardship that Dry Creek has faced to legally operate River Rock Casino, Dry Creek has been able to utilize gaming revenue to provide its citizens with essential governmental services, including housing assistance, educational programs and special needs assistance. Funds are limited; however, Dry Creek has leveraged its staff to seek grant funding to develop a low-income tribal elder housing project in Cloverdale on fee lands acquired by Dry Creek using grant funding. Gaming revenue provides essential funding to operate the Dry Creek government.

62.    Dry Creek is headquartered in Santa Rosa, California, in a location located outside of the Dry Creek Rancheria. The Tribal Government Office is located twenty-one miles from the Dry Creek Rancheria due to the limited space available on the Rancheria. The proposed Project Site is located between the Dry Creek Rancheria and the Dry Creek Tribal Government office, and is approximately two miles from the Tribal Government office.

*Cloverdale*

63.    Plaintiff Cloverdale is also a federally recognized Indian tribe. Cloverdale currently has nearly 600 members.

64.    Plaintiff Cloverdale's ancestral territory is located approximately ninety (90) miles north of San Francisco, in Sonoma County. Makamotcemei is the aboriginal name of the people which encompassed several villages with individual chiefs, yet all the villages spoke the same

dialect and practiced the same customs and traditions.

65.     In 1921, approximately 27.5 acres of land was purchased and then deeded to "the Cloverdale Rancheria." Cloverdale Tribal members lived and worked amongst the community of homesteaders and settlers, which eventually formed the current city of Cloverdale. Tribal members established home sites and a Tribal cemetery on the Cloverdale Rancheria. The city of Cloverdale is designated on the map above.

66.     In 1958, the U.S. terminated the Cloverdale Rancheria pursuant to the Rancheria Act of 1958. The land was distributed to individual tribal members and eventually the State of California for construction of State Highway 101.

67.     In 1979, Cloverdale joined several other tribes in a lawsuit seeking to restore the reservation and its tribal status. In 1983, Cloverdale and several other tribes entered a stipulated judgment wherein the U.S. agreed to restore and recognize Cloverdale's status as an Indian tribe as it existed prior to termination. Cloverdale, although recognized, remained landless.

68.     In 2004, Cloverdale entered into an agreement with an investor to provide Cloverdale with the financial resources needed to purchase land contiguous to the former Cloverdale Rancheria land. The transaction was more than a purchase agreement to Cloverdale— it was the restoration of land that was once home to the people of Cloverdale. In 2008, acting Deputy Assistant Secretary George Skibine issued a favorable restored lands opinion for Cloverdale. It would take another eight (8) years for the Assistant Secretary to make a final agency determination to acquire approximately 61.83 acres of land in trust for Cloverdale for gaming and other purposes. Cloverdale's efforts to have BIA acquire its land into trust for Cloverdale was a multi-decade effort that prompted Cloverdale to purchase land contiguous to the former Cloverdale Rancheria land, and yet still required another eight (8) years for a final agency determination to

place the property into trust.

69.    Since restoration, Cloverdale has repeatedly attempted to acquire land; however, due to numerous obstacles, including the unavailability of land, delay from DOI, and the lack of financial means to purchase land, Cloverdale has been unable to take definitive steps to reacquire a land base.

70.    Today, approximately seventy percent (70%) of Cloverdale's tribal members reside within a fifty (50) mile radius of Cloverdale, California. Cloverdale still does not possess a land base and continues to seek to reestablish its homeland to assist in facilitating Tribal self-determination and economic development.

**B.    Background on Koi**

71.    Koi, unlike each of the Plaintiffs, is a Southeastern Pomo Indian Tribe. Southeastern Pomo tribes, like the Koi, have a historically different language and culture from other Pomo tribes, such as Lytton and other Southern Pomo tribes. These different Pomo tribes traditionally used "distinct and sharply bounded languages" for which "there was no mutual intelligibility."[5]

72.    Koi's aboriginal territory is located around the southeastern portion of Clear Lake in Lake County, California. Indeed, Koi is named after the Koi village that was located on an island in that lake, and until 2022, Koi was known as the Lower Lake Rancheria. Koi has consistently treated this aboriginal territory as its homeland and has a long history of defending it from development. For example, in 2023, Koi filed two lawsuits against the City of Clearlake in an attempt to halt the construction of an airport-related commercial center and a sports complex near this aboriginal territory. In these lawsuits, Koi characterized territory near Clear Lake as "the area

---

[5]    *See* Exhibits to Koi Request for Restored Land Opinion, at 503-08.

of traditional and cultural affiliation of [Koi]" with "archaeological, cultural, and Tribal Cultural Resources."

73.     The location of the Koi village is designated on the map above, and the Southeastern Pomo tribes' aboriginal land is outlined in red. Koi, unlike Plaintiffs, has no significant historical connection to the town of Windsor or Sonoma County.

74.     Koi has approximately 80-90 members—far fewer than the membership of each Plaintiff.

75.     In 1916, the U.S. government purchased rancheria land for Koi in Lake County, California, where Koi members lived for several decades. The location of that rancheria is designated on that map above. However, Koi has not had a reservation since the 1950s, and was denied federal recognition between 1956 and 2000.

76.     Since 2000, Koi has partnered with out-of-state tribes and investors in various aborted attempts to obtain lands to build gambling sites. These attempts constituted blatant "reservation-shopping." Koi had no significant historical connection to any of these sites, but those sites would be advantageous locations for multi-million-dollar gambling facilities. For example, in 2005, Koi announced plans to build a "world-class" tribal government building and gaming facility near Oakland International Airport (Alameda County). Then, in 2006, Koi asked DOI to designate a parcel in Los Banos (Merced County) to be eligible for gaming. And in 2014, Koi was one of eight applicants for the development of a site in Vallejo (Solano County) for a proposed $850 million gaming site.

### C.    **The Proposed Project**

77.     Koi's proposed Project is the culmination of these reservation-shopping efforts. The Project is not located in or near Koi's aboriginal land. Instead, the Project Site is in Sonoma

County, within the aboriginal land of the Southern Pomo Tribes, a few miles away from the original Lytton Rancheria, the Lytton Homeland, and the Dry Creek Rancheria.

78.    The Project includes a three-story casino, five-story hotel, ballroom/meeting space, and associated parking and infrastructure. The gaming component of the facility would be approximately 538,137 square feet and include 2,750 gaming devices with 105 table games. The hotel component of the facility would be approximately 268,930 square feet and consist of 400 rooms. Approximately 5,119 parking spaces would be provided on the ground floor of the casino, as well as in a four-story parking garage and an overflow surface parking lot. Other supporting infrastructure, including proposed water treatment and wastewater treatment facilities, would be located on the southeastern portion of the Project Site. Koi's aerial rendering of the proposed Project appears below:



79.    The Project would be built in an unincorporated portion of Sonoma County, zoned for agriculture, amidst quiet neighborhoods and vineyards. Under preexisting land use restrictions, Koi could not build the Project at the Project Site.

80.    In order to build the Project, Koi needed BIA to (a) issue the FEIS for the Project,

and (b) approve the application to land into trust pursuant to the "restored lands" exception of the Indian Gaming Regulatory Act.

81.     The Project was and is opposed by a number of other tribes, including Plaintiffs, as well as the Town of Windsor, the County of Sonoma, members of California's U.S. House and Senate delegation, the Governor of California, State Assembly and Senate members, groups of local concerned citizens, and other political and business leaders in the Santa Rosa area.

   **D.**  **The Pre-Approval and Failed Consultation Process**

82.     In December 2021, Cloverdale sent a letter to BIA explaining Cloverdale's concerns and requesting that BIA consult with the tribes of Sonoma County, including Plaintiffs, prior to approving the Project. In April 2022, Cloverdale sent a letter to the DOI reiterating and expanding upon Cloverdale's concerns.

83.     On information and belief, BIA first engaged in preliminary discussions of the Project and studies of the Project Site—including test trenching and field surveys—in mid-2022. BIA did not communicate with Plaintiffs or any other tribes with cultural connections to the Project Site before conducting this fieldwork.

84.     In June 2022, Cloverdale sent a letter to BIA requesting, among other things, a public scoping hearing and a thirty-day extension to submit comments on the appropriate scope of environmental issues to be considered in the Environmental Assessment ("EA") for the Project.

85.     In September 2022, BIA issued its scoping report for the Project (the "Scoping Report") without having consulted with Plaintiffs or other affected tribes regarding the Project.

86.     After the release of the Scoping Report, in September 2022 Dry Creek sent BIA a letter requesting that the various field surveys, studies, and cultural reports referenced in the Scoping Report be shared with Dry Creek. BIA did not respond.

87.    In December 2022, Dry Creek again sent a letter to BIA, requesting consultation and information regarding the surveys and site testing that had been conducted at the Project Site. BIA did not send the requested reports until nearly nine months later.[6]

88.    In September 2023, BIA prepared an EA for the Project. Excluding citations and appendices, the EA was a total of 217 pages. The public was given 60 days to comment on the EA.

89.    Despite Dry Creek's previous requests for consultation, BIA did not meet with Dry Creek to discuss the Project until November 2023, months after the EA was issued. This purported "consultation" consisted of a single meeting with Regional Director Amy Dutschke and NEPA Specialist Chad Broussard. During this meeting, BIA's representatives summarily dismissed Dry Creek's concerns regarding the Project's impact on places of religious and cultural significance.

90.    In March 2024, DOI waived the Part 83 acknowledgment requirements of 25 C.F.R. §§ 292.10(b) and 292.11(b), thereby "permitting [DOI] to review [Koi's] application on equal footing as Tribes acknowledged pursuant to Part 83."

91.    In June 2024, BIA issued a Draft EIS ("DEIS"[7]) for the project. The DEIS totaled almost 6,000 pages, large portions of which included highly technical analyses and data. Nevertheless, the public was provided only 45 days to comment on the DEIS. Plaintiffs each requested limited extensions of time to respond to the DEIS, but these requests were not granted. As Lytton and Dry Creek later noted in their comments to the DEIS, the 45-day comment period was inadequate.

92.    On July 10, 2024, the California Department of Parks and Recreation, Office of

---

[6]    It was only upon receipt of these reports that Dry Creek discovered that cultural resources at the Project Site were subjected to destructive obsidian hydration testing, without Dry Creek or other tribes' knowledge, presence, or consent.

[7]    As used herein, the term "EIS" refers to the DEIS and FEIS collectively.

Historic Preservation ("OHP") wrote a letter admonishing BIA for its inadequate consultation with tribes affected by the Project. The letter concluded that BIA's consultation efforts to date were deficient, and the State Historic Preservation Officer urged BIA to reinitiate Section 106 consultation with local Sonoma County tribes.

93.     On July 23, 2024, Lytton sent a letter to DOI to request consultation on 25 C.F.R. Part 292. Lytton suggested that the consultation be held in person on August 6, 2024 at Lytton's government offices. Lytton did not receive a response to this letter.

94.     On July 30, 2024, Cloverdale sent letters to DOI and BIA requesting consultation on the Project, specifically, and 25 C.F.R. Part 292, generally.

95.     In August 2024, BIA rejected requests from local tribes—including Plaintiffs—to extend the comment period for the DEIS. In doing so, BIA declined to provide affected tribes with the opportunity to meaningfully review the DEIS, further thwarting any possibility of meaningful consultation with the Plaintiffs regarding the Project.

96.     Though BIA continued to decline to hold an in-person consultation with Lytton, BIA finally agreed to hold a Zoom meeting with Lytton. That Zoom meeting was scheduled for August 19, 2024. In advance of that meeting, Lytton sent a letter to BIA proposing discussion topics for the meeting, including regarding BIA's interpretation of the "significant historical connection" requirement under 25 C.F.R. § 292.12(b), and asked for a response by August 15, 2024. The Regional Director promised to respond after the PDAS-IA, Wizipan Garriott, had confirmed his agreement to the discussion topics—yet Garriott never did so and the Regional Director never responded.

97.     On August 15, 2024, Cloverdale sent a letter to BIA reiterating the request for consultation on the Project, specifically, and 25 C.F.R. Part 292, generally.

98.     On August 16, 2024, Lytton cancelled the August 19, 2024 meeting because of BIA's failure to respond to its August 12 letter or otherwise propose topics for discussion. Lytton reiterated that it would welcome future consultation with approved topics and expressed hope that such future consultation would take place in-person.

99.     On September 17, 2024, Lytton sent BIA a formal request for individual Section 106 consultation in connection with the Project. BIA never responded to this request.

100.    On September 20, 2024, Plaintiffs and BIA held a group meeting to discuss the Project and another project pending BIA approval. This meeting was ineffective, lacked substance, and was inconsistent with the DOI's process for proper consultations, which are supposed to be "rooted in meaningful dialogue where the viewpoints of tribes and DOI, including its bureaus and offices, are shared, discussed, and analyzed."[8] Indeed, BIA characterized the meeting as a "technical assistance" meeting rather than a formal consultation. BIA spent much of the meeting describing its stances on various procedural matters, such as its belief that non applicant-Tribes such as Plaintiffs cannot receive or review the evidence provided by Koi to support its restored lands application.

101.    Plaintiffs nonetheless attempted to lodge their concerns about the Project during the meeting. For example, Cloverdale's Tribal Treasurer, Vickey Macias, explained that Koi had altered a historical trade routes map previously used by Cloverdale in support of its gaming application, then passed it off as its own. No one from BIA responded to this claim, at the meeting or otherwise.

102.    Also at that meeting, the Gaming Director confirmed that the Assistant Secretary

---

[8]     DOI Department Manual, 512 DM 5, *Procedures for Consultation with Indian Tribes*, available at https://www.doi.gov/sites/doi.gov/files/elips/documents/512-dm-5.pdf.

had a conflict with respect to the Project, but both the Gaming Director and Regional Director stated that they did not have conflicts. The Gaming Director and Regional Director also represented that Wizipan Garriott, the then-PDAS-IA, would be the principal decisionmaker on the Project.

103. At the close of the meeting, the Gaming Director stated that a follow-up letter would be prepared that outlined the issues discussed. No such follow-up letter was ever sent.

104. In October 2024, various members of the U.S. Congress sent a letter to DOI, noting with alarm that BIA's assessment of the Project to date "lacked meaningful consultation with local impacted tribes." The letter also noted that the members were "deeply troubled" by DOI's use of its discretionary authority to "waive regulations twice related to these controversial projects."

105. On October 25, 2024, in light of the Gaming Director's failure to provide a follow-up letter as promised, Lytton sent BIA a letter summarizing points discussed during the September 20, 2024 meeting. The letter requested that BIA confirm or clarify these points. BIA never responded to this request.

106. On October 31, 2024, Dry Creek sent a letter to BIA raising concerns related to the Project. Among them, Dry Creek noted that federal approval will conflict with California state policies that were the result of ongoing consultation between California tribes. The letter also noted that Dry Creek's tribal cultural resources were found in the vicinity of the Project Site, and that "[i]f Native American human remains are discovered on the [Project] Site today (which is likely given the cadaver dog testing), the Dry Creek Rancheria would be the Most Likely Descendant of such ancestors." Upon information and belief, BIA never responded to this letter.

107. On November 11, 2024, Cloverdale sent a letter to BIA raising concerns related to BIA's application of 25 C.F.R. Part 292 with respect to the Project.

108.    On November 21, 2024, the day before BIA released the FEIS, BIA finally reached out to various tribes—including Plaintiffs and Graton—to invite them to a virtual consultation.

109.    This late-stage attempt at consultation was sorely lacking. Not only would the meeting be virtual, but it was also scheduled for November 27, 2024—less than a week after BIA sent the invitation, and a day before the Thanksgiving holiday. Further, the meeting was to be held with numerous tribes all at once, such that individual tribes would not have the opportunity to fully air their concerns and engage in a meaningful one-on-one dialogue with BIA. The meeting also was scheduled on the same day as two other similar virtual, large-group consultations regarding separate projects involving other controversial restored land applications. Because of these shortcomings, Lytton declined to attend the virtual meeting. Lytton also believed that the meeting would be unproductive because BIA never responded to Lytton's October 25, 2024 letter requesting clarification as to several issues discussed at the September 20, 2024 meeting.

110.    Dry Creek and Cloverdale, along with three other invited tribes, did attend the virtual consultation with BIA on November 27, 2024. However, the consultation was ineffective and perfunctory. There was no agenda for the meeting. Though present at the meeting, the PDAS-IA stated that he did not know much about the Project and was not in the position to answer questions about the Project. As a result, BIA did not engage in meaningful dialogue with the attending tribes, and individual tribes were given little opportunity to present their concerns. Indeed, that this consultation occurred just weeks before the issuance of the FEIS demonstrates that the consultation was a half-hearted attempt at "checking a box" under NEPA.

111.    On November 22, 2024, BIA released the FEIS for the Project. The FEIS totaled almost 10,000 pages. Like the DEIS, the FEIS included thousands of pages of highly technical, complex materials in its appendices. Despite the length and technical complexity of the materials

contained in the FEIS, BIA provided a comment period of only thirty (30) days—*i.e.*, the month between Thanksgiving and Christmas holidays—and it did not provide a public hearing on the FEIS. Nor did the FEIS initially provide instruction on how to submit comments.

112.    Recognizing that thirty (30) days would not be enough time to fully review the FEIS and meaningfully participate in the comment process, Plaintiffs and other commenters requested that the public comment period for the FEIS be extended, and that BIA provide instructions for how to submit comments. Despite the size of the FEIS, and despite the fact that Sonoma County was in the midst of an ongoing state of emergency due to historical flooding from a November 2024 storm, BIA did not respond to Plaintiffs' request or provide a substantive explanation for its refusal to grant the request.

113.    On December 5, 2024, Cloverdale sent a letter to BIA requesting consultation if BIA were to reinstate Section 106 consultation in accordance with OHP's recommendations.

114.    On December 10, 2024, Lytton and Cloverdale met with representatives of BIA and DOI, including the Regional Director, then-PDAS-IA Wizipan Garriott, and then-Gaming Director Paula Hart. At this meeting, Lytton and Cloverdale directly asked Garriott if he possessed any conflicts of interest with respect to the Project, and he claimed that he did not. Lytton and Cloverdale also expressed their significant concerns with the inadequate consultation process to date and numerous issues with the FEIS. When asked about her promised follow-up letter, Hart stated that she had been busy but still planned to send it—yet she did not do so before leaving the position of Gaming Director in January 2025. Further, when asked about multiple claims she made in the prior meeting, Hart retracted those points and said that she must have been mistaken in the prior meeting. The Regional Director, Garriott, and Hart subsequently ended the meeting abruptly because Garriott had another meeting scheduled.

E.    **The January 2025 Approvals**

115.    On January 13, 2025, BIA issued its ROD for the trust acquisition of the Project Site for Koi.

116.    On the same day, BIA approved Koi's fee-to-trust application and the Notice of Decision included an affirmative decision approving the Koi request for an Indian Land Opinion that the Project Site's parcel qualified as restored lands and were eligible for gaming.

117.    The BIE Director signed both the ROD and the Koi ILO as "Director, Bureau of Indian Education, Exercising by delegation the authority of the Assistant Secretary – Indian Affairs."

118.    None of the Plaintiffs had ever met or communicated with the BIE Director during the tribal consultation process. Upon information and belief, the BIE Director was never involved in the process leading up to Koi's application and lacks the authority and expertise to make such a determination.

## COUNT I

**(Violation of the APA and IGRA –
Unlawful Application of Restored-Lands Exception)**

119.    Plaintiffs reallege and incorporate each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

120.    Plaintiffs bring this cause of action under the APA to invalidate, void, and reverse the fee-to-trust transfer for the Project Site based upon Defendants' unlawful application of the IGRA's restored lands exception and issuance of the Koi ILO.

121.    The IGRA generally prohibits gaming on trust lands acquired after 1988, but provides an exception—known as the "restored lands exception"—where such lands are "taken into trust as part of . . . the restoration of lands for an Indian tribe that is restored to Federal

recognition." 28 U.S.C. §§ 2719(a), 2719(b)(1)(B). Likewise, federal regulations promulgated under the IGRA specify that to qualify as restored lands, the relevant Indian tribe must, *inter alia*, "demonstrate a significant historical connection to the [restored] land." 25 C.F.R. § 292.12. For a "significant historical connection" to exist, the land must be "located within the boundaries of the tribe's last reservation under a ratified or unratified treaty, or a tribe can demonstrate by historical documentation the existence of the tribe's villages, burial grounds, occupancy or subsistence use in the vicinity of the land." 25 C.F.R. § 292.2.

122.    Because the restored lands exception "was not intended to give restored tribes an open-ended license to game on newly acquired lands," the Secretary of the Interior "needs to ensure that tribes do not take advantage of the exception to expand gaming operations unduly and to the detriment of other tribes' gaming operations." *Rancheria v. Jewell*, 776 F.3d 706, 711 (9th Cir. 2015).

123.    Koi's requested fee-to-trust transfer does not qualify as "restoration of lands" under the IGRA. The Project Site was not within Koi's aboriginal territory, and Koi has not historically occupied or used the Project Site or any lands in proximity of the Project Site. Thus, the Project Site could not have been "restor[ed]" to Koi.

124.    Similarly, the Project Site does not have any "significant historical connection" to Koi. The Project Site is not "located within the boundaries of [Koi's] last reservation" (25 C.F.R. § 292.2), which was located in Lake County, dozens of miles away from the Project Site. Likewise, Koi cannot "demonstrate by historical documentation the existence of [Koi's] villages, burial grounds, occupancy or subsistence use in the vicinity" of the Project Site. *Id.*

125.    Nevertheless, Defendants approved Koi's fee-to-trust application and approved the Koi request for an Indian Land Opinion that the Shiloh parcel qualified as restored lands and were

eligible for gaming, wrongly applying the "restored lands exception" to the Project and the Project Site.

126.    The Koi ILO was, *inter alia*, inconsistent with BIA's past decisions regarding the restored lands exception, offered inadequate explanations for its decision, failed to consider all relevant evidence submitted by interested parties, relied on irrelevant factors, and was internally inconsistent. It therefore was both contrary to law and arbitrary and capricious.

127.    For example, Defendants determined that Koi showed a "significant historical connection" to the land in part because it submitted evidence of "occupancy or subsistence use in the vicinity of" the Project Site. Koi ILO 18-20 (referencing 25 C.F.R. § 292.2).

128.    Defendants concluded that Koi had shown "occupancy or subsistence use" because the Tribe "had extensive trade routes and trade networks throughout the California coastal region including the area of the [Project] Site." Koi ILO at 20. But neither Defendants nor Koi has ever shown any evidence that any Koi tribal member even walked across the Property. Moreover, BIA historically has considered evidence of an aboriginal trade route to be insufficient to show "occupancy or subsistence use" in an area, as such trade routes are transitory in nature. In fact, when BIA promulgated its Final Rule establishing the "significant historical connection" requirement, it explicitly stated that it had reviewed comments "both in favor of and against a tribe's ability to establish a connection to the land when their past contacts were transitory or brief in nature"; rejected the notion that such transitory contacts should create such a connection to the land; and thus implemented "[t]he definition of 'significant historical connection' [that] establishes criteria which require something more than evidence that a tribe merely passed through a particular area."[9]

_____

[9]    See Final Rule, "Gaming on Trust Lands Acquired After October 17, 1988," Department

129.    BIA in the past consistently applied this principle when making fee-to-trust determinations. For example, in an Indian Lands Opinion to the Guidiville Band of Pomo Indians in 2011 (the "Guidiville Band ILO"), BIA noted that the Guidiville Band could not "establish its subsistence use or occupancy based on the fact that its ancestors traveled to various locations to trade and interact with other peoples and then returned to the Clear Lake region. Subsistence use and occupancy requires more than a transient presence in an area."[10]

130.    Apparently attempting to avoid this deficiency, the Koi ILO cited certain "forced labor, and later, voluntary labor and occupancy [of the Koi] in what became Sonoma County" and concluded that "[t]hese labor patterns establish more than a mere 'transient presence in an area.'" Koi ILO at 20.

131.    But to reach this conclusion, Defendants had to include *transient* labor patterns in its definition of "occupancy," something they had not done before.

132.    Indeed, when read as a whole, the paragraph referring to Koi's "forced labor, and later, voluntary labor and occupancy" makes clear that Defendants read the term "occupancy" to include labor that was transient in nature. Defendants' conclusion stems from evidence of Koi's "migratory and seasonal labor," rather than consistent presence on the land.

133.    The significance of stretching the term "occupancy" in this way is twofold. First, including seasonal or migratory "labor patterns" within the meaning of "occupancy" flies in the

---

of Interior, 25 CFR Part 292 (May 20, 2008), *available at* https://www.federalregister.gov/documents/2008/05/20/E8-11086/gaming-on-trust-lands-acquired-after-october-17-1988 (responding to a comment stating "that a tribe should not be able to establish a historical connection if they are a disparate group of traveling Indians traveling through territory at some point in their distant history").

[10]    Letter from Larry Echo Hawk, Assistant Sec'y – Indian Affairs, U.S. Dep't of the Interior, to Merlene Sanchez, Chairperson, Guidiville Band of Pomo Indians (Sept. 1, 2011), *available at* https://www.bia.gov/sites/default/files/dup/assets/public/pdf/idc015051.pdf.

face of Defendants' previous emphasis on a Tribe's "continuous, centuries-old connection to the parcel of land at issue" when making restored land determinations.[11] Second, the determination flatly contradicts Defendants' previous restored lands decisions. In the Guidiville Band ILO, for example, BIA was unpersuaded by evidence of the tribes' ancestors being relocated due to a federally-sponsored forced labor program in which "young Indian women [were sent] to the Bay Area . . . to work as domestic servants." BIA explained that as "regrettable as the [program] was, the relocation" of the band's ancestors due to forced labor was insufficient to meet regulatory standards.

134.    The application of the restored-lands exception to property simply because that property was part of a tribe's historical trade route or labor pattern would dramatically expand the scope of the restored-land exception.

135.    Moreover, even if it were appropriate for Defendants to consider trade routes sufficient to establish a "significant historical connection," Defendants ignored critical evidence contradicting the existence of such routes. For example, the September 20, 2024 consultation between Plaintiffs and the Gaming Director, Cloverdale's Tribal Treasurer, Vickey Macias, explained that Koi had altered a trade routes map previously used by Cloverdale in support of its own gaming application, then passed it off as its own. But Defendants failed to address the alteration of that map, in the Koi ILO or otherwise.

136.    The Koi ILO also relied on evidence that Koi "used the area around the [Project

---

[11]    *See, e.g.*, Letter from John Tahsuda, Principal Deputy Assistant Sec'y – Indian Affairs, Dep't of the Interior, to Shawn Davis, Chairperson, Scotts Valley Band of Pomo Indians at 8, 17 (Feb. 7, 2019) (citing *Grand Traverse Band of Ottawa and Chippewa Indians v. United States Attorney for the Western District of Michigan,* 198 F. Supp. 2d 920, 925 (W.D. Mich. 2002), aff'd, 369 F.3d 960 (6th Cir. 2004); *see also* Guidiville Band ILO at 14 (explaining that "[o]ccupancy can be demonstrated by a consistent presence in a region supported by the existence of dwellings, villages or burial grounds, as alluded to in the regulations").

Site] as burial grounds for over a century," while simultaneously conceding that the "traditional burial sites are difficult to locate because the Koi historically cremated their dead instead of burying them." Koi ILO at 20. As with the evidence submitted by Cloverdale, Defendants failed to acknowledge contrary evidence submitted by Dry Creek that actual human remains of the Dry Creek people—not Koi—are the most likely to be found on the Project Site.[12] In fact, evidence—including Koi's own assertions in the lawsuits it filed against the City of Clearlake in 2023—demonstrates that Koi's historical burial grounds are located in Lake County, not at or near the Project Site.[13]

137.    Defendants ignored a host of other objections raised by interested parties in issuing the Koi ILO. For example, Defendants mentioned but failed to respond to the objection by the late Senator Feinstein and Senator Padilla that the Koi has been reservation-shopping, this being "their third attempt to build a casino in the Bay Area." Koi ILO at 15 (citing Letter from Senator Diane Feinstein and Alex Padilla to Secretary Haaland (Nov. 4, 2022)).

138.    The Senators noted that "[a]bsent [a] significant historical connection, the [T]ribe is intruding on other tribes' ancestral homelands and unreasonably disrupting the considered planning and zoning efforts of affected communities." Koi ILO at 15.

---

[12]    *See* Letter from Chris Wright, Chairman, Dry Creek Rancheria Band of Pomo Indians, to Paula Hart, Director, Office of Indian Gaming – Office of the Assistant Sec'y – Indian Affairs, U.S. Dep't of Interior, Re: Opposition to Koi Nation Restored Lands Request (Oct. 31, 2024).

[13]    *See* Verified Petition for Writ of Mandate and Complaint for Declaratory Relief, Injunctive Relief, and for Attorneys' Fees at 12, *Koi Nation of Northern California v. City of Clearlake, et al.*, No. CV-423786 (Cal. Sup. Ct., Lake County) (describing Koi's "burial practices" that took place near the City of Clearlake); Verified Petition for Writ of Mandate and Complaint for Declaratory Relief, Injunctive Relief, and for Attorneys' Fees at 34, *Koi Nation of Northern California v. City of Clearlake, et al.*, No. CV-424401 (Cal. Sup. Ct., Lake County) ("Sites within the City [of Clearlake] include sacred sites, village sites, [and] **burial grounds**" that are "important to the culture of [Koi].") (emphasis added).

139.    In response to the varied objections raised by numerous parties, the Koi ILO simply made the following one-sentence reply: "In response to the letters of opposition of acquiring the [Project Site] in trust, we note that there is no requirement that restored land be within a tribe's aboriginal area or that the tribe show it exclusively used the lands." Koi ILO at 17.

140.    The Koi ILO's failure to address contrary evidence, lack of explanation for Defendants' change in position, and other inconsistencies has more to do with Defendants' desire to approve Koi's application prior to the change in administration than with the proper application of the governing regulations.

141.    This is apparent from the Koi ILO's discussion of the governing law. The Koi ILO emphasizes that the restored land exception is "to be read broadly" with "perceived gaps or inconsistencies within the historical documents [to] be . . . resolved in favor of the applicant tribe." Koi ILO at 19. And it discusses the need to view evidence "within the context of the violence and disregard for Indian life that were hallmarks of California from the 1820s to the early 1900s." Koi ILO at 19. But Defendants have rarely, if ever, taken such a generous view of the restored land exception. And for good reason: Because almost all tribes have experienced forms of violence, forced displacement, and/or forced labor, reviewing evidence in this manner essentially expands the exception to the point that it could apply virtually anywhere. In fact, BIA previously denied the Guidiville Band a restored lands determination *despite* acknowledging that "the mission and rancheria eras were marked by significant displacement of Indian peoples in present-day northern California." Guidiville Band ILO at 17.

142.    While the restored lands exception requires "documentation [of] the existence of the tribe's villages, burial grounds, occupancy, or subsistence use in the vicinity of the land," so as to demonstrate a Tribe's unique, "historical connection" to a parcel, BIA's treatment of Koi's

evidence makes it possible for any tribe to obtain a restored lands exception at any place it wants.

143.    Accordingly, BIA's decision to apply the "restored lands exception" was arbitrary, capricious, an abuse of discretion, in excess of its authority, without observance of the procedure required by law, and otherwise not in accordance with the law. 5 U.S.C. § 706(2).[14]

## COUNT II

### (Violation of APA –
### Improper Delegation of Decision-making Authority)

144.    Plaintiffs reallege and incorporate each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

145.    Plaintiffs bring this cause of action under the APA to invalidate, void, and reverse the fee-to-trust transfer for the Project Site based upon Defendants' improper issuance of the ROD and the Koi ILO.

146.    The ROD and the Koi ILO are *ultra vires* because they were issued by the BIE Director, who lacks authority to issue such decisions.

147.    Pursuant to 25 C.F.R. § 151.13, the only officials authorized to take action on a request to take land into trust are: (1) the Secretary; (2) the Assistant Secretary, pursuant to delegated authority; and (3) BIA, pursuant to delegated authority. Further, only decisions made by the Secretary and the Assistant Secretary, including pursuant to delegated authority, are considered

---

[14]    Notably, if the relief sought by Plaintiffs is granted and the Court orders the reversal of the fee-to-trust transfer for the Project Site, Koi would not be foreclosed from pursuing the establishment of the gaming facility via other avenues. For example, Koi would be able to seek a "two part determination" pursuant to Section 20(b)(1)(A) of the IGRA, which permits tribes to establish gaming operations that would otherwise be prohibited under the IGRA if the Secretary determines that the gaming establishment (i) would be in the best interest of the tribe, and (ii) would not be detrimental to the surrounding community (including nearby tribes). In other words, a finding that the "restored lands exception" was erroneously applied here does not definitively doom the Proposed Project.

final. *Id.* § 151.13(c). Decisions made by BIA officials pursuant to delegated authority are not final. *Id.* §151.13(d).

148.    On January 13, 2025, the BIE Director, purportedly on behalf of the Assistant Secretary, issued the Koi ILO. The Koi ILO stated that the decision constituted a final agency action. Koi ILO at 29. The Koi ILO was signed by Tony Dearman as "Director, Bureau of Indian Education, Exercising by delegation the authority of the Assistant Secretary – Indian Affairs."

149.    On the same day, the BIE Director, purportedly on behalf of the Assistant Secretary, issued the Koi ROD. The ROD confirmed that DOI would acquire the Project Site in trust for Koi for gaming purposes. The Koi ILO was signed by Tony Dearman as "Director, Bureau of Indian Education, Exercising by delegation the authority of the Assistant Secretary – Indian Affairs."

150.    Neither the Koi ILO nor ROD specifies whether, or in what manner, authority to issue final decisions for the DOI was delegated to the BIE Director, who plays no role in evaluating whether lands are eligible for gaming.

151.    Delegations of authority within DOI are governed by DOI's Department Manual. However, the DOI's Department Manual did not permit delegation to the BIE Director here.

152.    In particular, the Department Manual authorizes the Assistant Secretary to exercise the authority of the Secretary. *See* 209 DM 8.1. In turn, the Assistant Secretary may redelegate his authority "in the form of a Department Manual release issued in compliance with the provisions of 200 DM 3." 209 DM 8.3.

153.    However, on information and belief, the Assistant Secretary and the Assistant Secretary's delegees did not redelegate their authority to the BIE Director in accordance with the requirements of the Department Manual, and the BIE Director did not otherwise receive a valid and timely delegation of authority.

154.    Courts have long recognized that a federal agency is obliged to abide by the regulations it promulgates. *Wilson v. Commissioner of Social Sec.*, 378 F. 3d 541, 545 (6th Cir. 2004); *see also, e.g.*, *Simmons v. Block*, 782 F.2d 1545, 1550 (11th Cir. 1986) ("The failure of an agency to comply with its own regulations constitutes arbitrary and capricious conduct").

155.    Neither agency regulations nor the Departmental Manual authorized the BIE Director to take action on the Koi trust request. Therefore, the Koi ILO and ROD issued on January 13, 2025 were invalid, void, and *ultra vires*.

156.    As such, Defendants' issuance of the Koi ILO was arbitrary, capricious, an abuse of discretion, in excess of its authority, without observance of the procedure required by law, and otherwise not in accordance with the law. 5 U.S.C. § 706(2).

## COUNT III

### (Violation of the APA, NEPA, and U.S. Constitution – Application of *Ultra Vires* CEQ Regulations)

157.    Plaintiffs reallege and incorporate each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

158.    Plaintiffs bring this cause of action under the Declaratory Relief Act and the APA to invalidate and void the FEIS and ROD for the Project based upon Defendants' reliance on *ultra vires* CEQ Regulations.

159.    Defendants, in considering the environmental impact of the Project in the FEIS, applied and relied upon the CEQ Regulations. *See, e.g.*, FEIS § 1.1.3 (stating that ROD will be consistent with "the CEQA Regulations for Implementing NEPA"); *id*. § 2.1 (applying "CEQ NEPA Regulations" when assessing project alternatives); *id*. § 3.14 (considering cumulative environmental impacts and effects based upon CEQ regulations).

160.    However, "[n]o statute confers rulemaking authority on CEQ," and "CEQ had no

lawful authority to promulgate these regulations." *Marin Audubon Soc'y v. Fed. Aviation Admin.*, 121 F.4th 902, 914 (D.C. Cir. 2024). Likewise, DOI has not merely adopted the CEQ regulations or incorporated them by reference; rather, the purpose of DOI's own NEPA regulations is merely "for compliance with" CEQ regulations and to "supplement[], and . . . be used in conjunction with, the CEQA regulations." *Id.* at 914-15 (citing 43 C.F.R. §§ 46.10-20). Because the CEQ regulations are *ultra vires* and invalid exercises of presidential authority, Defendants' reliance on those regulations is unlawful.

161.     Because the FEIS and ROD apply and rely upon these regulations, they are *ultra vires* and invalid.

162.     The Court therefore should declare that Defendants' FEIS and ROD for the Project are *ultra vires*, void, and invalid and cannot be enforced and implemented.

## COUNT IV

### (Violation of NEPA, NHPA, and APA –
### Failure to Consult)

163.     Plaintiffs reallege and incorporate each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

164.     Plaintiffs bring this cause of action under the APA to invalidate and vacate the EIS and ROD for the Project based upon Defendants' failure to consult, as required by the NEPA, the NHPA, and associated regulations.

165.     Section 106 of the NHPA provides that planners of a federally supported project must take into account its effect on any area eligible for inclusion in the National Register of Historic Places, and agencies must consult with any Indian tribe that attaches religious and cultural significance to an eligible affected area. 54 U.S.C. §§ 302706, 306108. Further, NHPA regulations require that federal agencies ensure that this consultation process begin early in the project's

planning, and that affected tribes be given reasonable opportunities to identify concerns, advise on the identification and evaluation of historic properties, explain their views on a project's effects on these resources, and participate in resolving adverse effects. 36 C.F.R. § 800.2(c).

166.    Similarly, to the extent they are valid, the CEQ Regulations implementing NEPA require that agencies "consult[ ] **early** with appropriate State, Tribal, and local governments and with interested persons and organizations when their involvement is reasonably foreseeable." 40 C.F.R. § 1501.2(b)(4)(ii) (emphasis added). Thus, an agency's failure to engage in early and meaningful consultation with affected tribes violates the CEQ Regulations, as well.

167.    Each of Plaintiffs have significant cultural and historical ties to the Project Site and are deeply concerned about the impact of the Project—including on their ancestral territory, on evacuation procedures, the security of Lytton's housing development, and water, wildlife, cultural, and economic resources, among other things.

168.    As explained, despite Plaintiffs' deep connections to the Project Site, Defendants failed to meaningfully consult with or otherwise involve Plaintiffs in the early stages of assessing the Project. For instance, BIA conducted test trenching and field surveys and issued its Scoping Report before even attempting to consult with Plaintiffs or other affected tribes; Defendants either delayed responding to, or altogether ignored, Plaintiffs' requests for consultation and consultation information; and to the extent Defendants actually held consultation meetings with Plaintiffs, they amounted to short, non-substantive "box-checking" exercises rather than legitimate attempts to obtain Plaintiffs' input.

169.    Defendants' failure to meaningfully consult arose from their goal of approving the Project before the end of the Biden administration—regardless of whether Plaintiffs would have any meaningful opportunity to consult on the Project.

170.    Defendants' issuance of the FEIS and ROD without meaningful and early consultation with Plaintiffs violates the NHPA, NEPA, the CEQ Regulations, and the APA.

## COUNT V

**(Violation of APA and NEPA –**
**Failure to Provide the Public with the Opportunity for Meaningful Review)**

171.    Plaintiffs reallege and incorporate each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

172.    Plaintiffs bring this cause of action under the APA to invalidate and void the EIS and ROD for the Project based upon Defendants' failure to provide the public with a meaningful opportunity to review the Project.

173.    To the extent the CEQ Regulations are valid, they require that agencies "identify, consider, and disclose to the public relevant environmental information early in the process before decisions are made and before actions are taken." 40 C.F.R. § 1500.1(b). "Public disclosure and involvement is a key requirement of NEPA." *See* Indian Affairs NEPA Guidebook (Aug. 2012) § 2.1.

174.    Despite these requirements, Defendants consistently have failed to provide public comment periods commensurate with the length and complexity of materials released for the Project.

175.    Defendants gave the public 60 days to comment on the EA, 45 days to comment on the DEIS, and 30 days to comment on the FEIS (during the period from Thanksgiving to Christmas). Though the DEIS and FEIS (including their appendices) were thousands of pages long, Defendants refused to grant any requests for extension of these limited comment periods. Likewise, Defendants did not hold a public hearing on the FEIS, and for most of the comment period, the webpage for the FEIS did not include an instruction on how to submit comment.

176.    On information and belief, Defendants' refusal to extend the comment periods for the DEIS and FEIS arose from their goal of approving the Project before the end of the Biden administration—regardless of whether Plaintiffs or any member of the public would have any meaningful opportunity to review the Project. The failure to provide a reasonable amount of time for public review and comment was due to the predetermined decision-making. Instead of ensuring that their environmental studies appropriately evaluated the Project's significant impacts, including by conducting an unbiased analysis that considered the information provided by the public, including Plaintiffs, Defendants limited the time periods to ensure approval before the end of outgoing officials' terms.

177.    The limited time permitted for public comment, coupled with the increasing volume and complexity of materials provided in the EA, DEIS, and FEIS—as well as the ongoing state of emergency in Sonoma County in November and December 2024 due to severe flooding—meant that commenters were not provided an opportunity to fully and meaningfully review the FEIS and its precursors. As a result, Defendants were unable to engage in a meaningful dialogue with the public, as NEPA requires.

178.    Defendants' failure to afford public commenters with a meaningful opportunity to engage in dialogue regarding the Project renders its DEIS and FEIS inadequate under NEPA. Therefore, the Court should void and invalidate the EIS and the ROD.

## COUNT VI

### (Violation of NEPA and APA – Insufficient EIS)

179.    Plaintiffs reallege and incorporate each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

180.    Plaintiffs bring this cause of action under the APA to invalidate and void the EIS

and ROD for the Project based upon Defendants' failure to comply with NEPA when issuing the FEIS and ROD.

181.    NEPA requires that agencies "have available, and . . . carefully consider, detailed information concerning significant environmental impacts." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). Taking a "hard look" includes "considering all foreseeable direct and indirect impacts." *Center for Biological Diversity v. Salazar*, 695 F.3d 893, 916-17 (9th Cir. 2012). It also requires agencies to "address or refute" concerns presented in comments.

182.    Defendants, in certifying the FEIS and issuing the ROD, purport to have considered all significant environmental impacts and comments, concluding that "[a]ll potentially significant impacts would be minimized or avoided with recommended mitigation measures." Based on this analysis, Defendants moved forward with the Project.

183.    However, the FEIS fails to adequately respond to and consider comments from Plaintiffs regarding various significant impacts.

184.    Moreover, to the extent that the FEIS does identify and consider some of these impacts on Plaintiffs, its conclusion that the impacts would be "minimized or avoided" with mitigation measures is not supported by the record contained in the FEIS. For example, the mitigation plans proposed by Defendants are speculative, unenforceable, and based on hypothetical actions taken by third parties.

185.    Further, the FEIS acknowledged that socioeconomic impacts on Dry Creek were potentially significant, and concluded that no mitigation measures were feasible—yet approved the Project, anyway.

186.    As discussed in greater detail below, Defendants' failure to "take a hard look" at all significant environmental impacts, adequately address Plaintiffs' comments, or show that the

recommended mitigation measures would be enforceable and actionable constitutes a violation of NEPA and APA.

<u>Proposed Mitigation Measures Are Unenforceable and Speculative</u>

187.    As BIA itself acknowledges, "[a]ny mitigation measure must be enforceable[,] and it is important for BIA Regional and Agency Offices to establish monitoring programs to ensure that mitigation is carried out." Indian Affairs NEPA Guidebook (Aug. 2012) § 6.4.6. However, many of the mitigation measures proposed in the FEIS are facially unenforceable, for several reasons.

188.    First, BIA or other relevant federal agencies must have the ability to enforce the relevant mitigation measures. If "agencies lack the power to guarantee the improvements in question," then "the proper course is to exclude them from the analysis and consider only those actions that are in fact under agency control or otherwise reasonably certain to occur." *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 936 n.17 (9th Cir. 2008); *see also Pacificans for a Scenic Coast v. California Dep't of Transportation*, 204 F. Supp. 3d 1075, 1090 (N.D. Cal. 2016*)* (agency's reliance on a mitigation measure that was "not under [the agency's] control" constituted a violation of the APA). The mitigation measures contemplated in the FEIS are not enforceable by BIA and/or are otherwise outside of Defendants' control because they rely on a threshold determination by Koi or another third party that adverse impacts will occur or have already occurred.

189.    For example, in proposing mitigation related to groundwater impacts, the FEIS notes that an Interference Drawdown Monitoring and Mitigation Plan will be implemented "*[s]hould the Town of Windsor determine . . . that aquifer connectivity [results in] substantial decrease in water levels.*" FEIS at 4-1 (emphasis added). Because this mitigation plan relies on a

voluntary future action taken by a third party—the Town of Windsor—it is entirely speculative and cannot form the basis for rational decision making by Defendants.

190.    Second, Defendants' proposed mitigation measures are unenforceable, ineffective, and non-compliant with NEPA because they contain vague directives or mere plans to design mitigation strategies in the future.

191.    For example, one proposed mitigation plan states that "[a]lterations to riparian vegetation from construction activities *shall be avoided to the maximum extent possible*" (emphasis added), and proposed mitigation related to wildfire hazards suggests a laundry list of measures that "could be included." FEIS at 4-7 (emphasis added), 4-26.

192.    Because such proposed mitigation is vague and non-specific, and essentially constitutes plans to make mitigation plans at some unspecified point in the future, as a practical matter it cannot be meaningfully enforced.

193.    Moreover, this approach to mitigation violates NEPA because any eventual mitigation plans would be created outside of the NEPA process and shielded from public review or comment. *See N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1084 (9th Cir. 2011).

194.    Third, the mitigation measures are ineffective because they rely on enforceability against Koi, a sovereign. Koi has not waived its sovereign immunity, as is necessary for enforceability of mitigation measures,[15] and the applicable tribal law does not guarantee the mitigation measures' enforceability.

195.    In response to Lytton's concerns about the ability to enforce mitigation measures

_____

[15]    Koi's Gaming Ordinance explicitly states that it shall not "be construed to waive, in whole or in part, the Nation's sovereign immunity from unconsented suit."

against Koi, the FEIS claims that "any mitigation required by the ROD will be enforceable as a matter of Tribal law under Chapter 14 of the Tribe's Gaming Ordinance." FEIS App. P, Part 1 at 3-11.

196.     The referenced Gaming Ordinance, however, merely provides that "affected state or local governmental entit[ies] with an interest in the Applicable Mitigations" may "file[] a complaint with the [National Indian Gaming Commission ("NIGC")] alleging that the Nation has not complied with the Applicable Mitigations," and that "upon notice from the NIGC that such a complaint has been made, the Nation will submit to the NIGC's review and enforcement authority as set forth in 25 C.F.R. 573.1." On information and belief, this is the first instance in which Defendants have delegated enforcement of mitigation and BMP to the NIGC.

197.     Because "state or local government entit[ies]" is undefined in the Gaming Ordinance, it is unclear whether Plaintiffs would be permitted to file a complaint regarding Koi's non-compliance with mitigation measures.

198.     Moreover, the Gaming Ordinance does not make clear under what circumstance NIGC would accept or act upon any enforcement claim filed by Plaintiffs or other third parties.

199.     Nor does the FEIS or Gaming Ordinance identify what authority (if any) NIGC possesses that would permit NIGC to enforce the mitigation measures and BMPs.[16]

200.     Accordingly, the Gaming Ordinance does not guarantee that mitigation measures would be enforceable against Koi, and the FEIS's reliance on such mitigation measures is arbitrary and capricious.

---

[16]     NIGC has authority to regulate certain gaming operations and promulgate regulations to enforce the IGRA. *See, e.g.,* 25 U.S.C. §§ 2706, 2713. Plaintiffs are not aware of any legal authority that would permit the NIGC to expand its powers to non-gaming matters.

Failure to Adequately Address Wildfire Risks

201.    The FEIS fails to incorporate a meaningful analysis of the direct, indirect, and cumulative effects of the Project's construction on wildfire risks.

202.    The FEIS acknowledges that the Project Site is at "high risk" for wildfires, and that the construction of the Project "could increase the risk of wildfire." FEIS at 3-125, ES-26. Indeed, the Project Site is located directly adjacent to the burn perimeters of the highly destructive 2017 Tubbs Fire and 2019 Kincade Fire.

203.    Despite the significant risk to safety that is inherent in building and operating a large casino facility in—and bringing thousands of daily visitors to—such a high-risk area, the FEIS relies on entirely speculative, unenforceable mitigation measures and Best Management Practices ("BMPs")[17] to conclude that the Project's impact on wildfire risk would be less than significant. FEIS at ES-26.

204.    For example, the FEIS states that in order to mitigate potential impacts on fire protection services, Koi proposes to enter into "public service agreements, such as with the Sonoma County Fire District (SCFD) and other relevant agencies" which "would include the resources necessary to effectively manage the increase in service calls without placing an undue financial burden on local fire and EMS." FEIS App. P at 3-54; FEIS at 2-13. In connection with this proposed mitigation measure, Koi and SCFD entered into a Letter of Intent memorializing their intent to "enter a Memorandum of Understanding . . . to provide emergency services to include fire response, emergency medical services, fire prevention and all other all-risk response to the [Project]." FEIS App. O.

---

[17]    BMPs describe methods of engaging in construction or other activities in a way that reduces and minimizes the potential adverse impacts of a proposed action.

205.    This proposed mitigation plan is speculative and unenforceable because it relies on a currently nonexistent agreement that purportedly "would" include measures that address wildfire concerns. Further, the mitigation plan impermissibly relies on the cooperation and consent of third party agencies. Although there is a Letter of Intent between Koi and SCFD, the letter does not guarantee that the SCFD would actually respond to fire incidents at the Project Site, nor does it describe the terms of the contemplated public service agreement or guarantee that the terms would indeed adequately address wildfire concerns.

206.    Similarly, the FEIS relies on unenforceable and speculative BMPs to conclude that "impacts to fire protection and emergency services from project construction" would be "minimized." FEIS at ES-26.

207.    For example, the FEIS claims that BMPs would reduce the probability of fire ignition during construction. Such BMPs include "the prevention of fuel being spilled" and "putting spark arresters on equipment having the potential to create sparks." FEIS at 3-130. Yet Defendants do not explain: (i) how such vague BMPs are even enforceable, or (ii) whether these practices would indeed be effective in reducing wildfire risk. It is arbitrary and capricious for Defendants to rely on such ambiguous, poorly described practices to conclude that the wildfire risks from construction are insignificant.

Failure to Consider Lytton's New Housing Development and Traffic and Evacuation Concerns

208.    The FEIS is also insufficient because it fails to consider the construction of a new housing development on the Lytton Homeland, which was completed in 2024 (the "Lytton Homeland Housing").

209.    As Lytton explained in its comments to the DEIS and FEIS, the Project could have a disastrous impact on the traffic and evacuation processes for residents of the Lytton Homeland.

210.    As of February 2024, the Lytton Homeland Housing will have approximately 500 new residents subject to the wildfire evacuation route identified in the FEIS. In the event of a wildfire or other catastrophic event requiring evacuation, the construction and operation of the Project would have a significant impact on evacuation times and traffic routes—and could potentially put the lives of Lytton's members and the very existence of the Lytton Homeland at risk.

211.    Defendants purport to have considered the Lytton Homeland Housing and its additional residents in the FEIS's evacuation plan. Specifically, the FEIS claims that "[t]he wildfire evacuation model included within its assumptions the development of the Lytton Housing Project in Windsor, Shiloh Terrace, Shiloh Crossing, Clearwater, and other development projects." App. P at 3-17. However, this statement is not accompanied by any explanation or citation to any part of Defendants' analysis to show that the Lytton Homeland Housing was indeed included in the model's assumptions.

212.    There is no specific reference to the Lytton Homeland Housing in any of the FEIS's underlying studies regarding the impact on traffic and evacuation routes.

213.    Moreover, the FEIS's Evacuation Travel Time Assessment (App. N-2 at 6) does not list the Lytton Homeland Housing as one of the "key assumptions . . . used in the development of background and evacuation traffic demand." On information and belief, this Assessment relies on the Revised Traffic Impact Study contained in Appendix I, which in turn is based on data collected in 2022 and does not account for the Lytton Homeland Housing. The FEIS' evacuation maps also inexplicably split the Lytton Homeland in half and would arbitrarily force Lytton's tribal members to evacuate the Lytton Homeland using different evacuation routes.

214.    The construction of this new housing development constitutes a "significant new

circumstance[] or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1509(c)(1)(ii). Accordingly, under NEPA, Defendants were required to issue a supplemental FEIS that addressed the new housing development. *Id.*

215.    The FEIS's failure to properly account for the Lytton Homeland Housing in any meaningful way and Defendants' failure to issue a supplemental FEIS to address the Lytton Homeland Housing violates NEPA and the APA. If the Project were to proceed as planned, with such sparse and inadequate analysis of the impact of the Lytton Homeland Housing on evacuation processes, Lytton and other Plaintiffs will be irreparably harmed.

Failure to Consider Geographic Alternatives

216.    NEPA requires that Defendants "rigorously explore[ ] and objectively evaluate[]" "the full spectrum of reasonable alternatives" that would meet the "purpose and need" of the proposed action. 43 C.F.R. §§ 46.420(c), 46.420(a). The stated purpose and need of the Project is to "facilitate tribal self-sufficiency, self-determination, and economic development." FEIS at 1.2. And after evaluating the full range of alternatives, Defendants must "provide a basis for the selection of an alternative in a decision." 43 C.F.R. § 46.420(c).

217.    Despite Koi's aboriginal territory being located in Lake County, California—about 50 miles away from the Project Site—the FEIS fails to consider an alternative project site that is actually within Lake County. In fact, the Project Site is the *only* geographic location considered for the Project; the FEIS fails to consider any off-site alternative whatsoever.

218.    In response to concerns from Dry Creek regarding the failure to consider any geographic alternatives, the FEIS claims that "[n]o other available sites have been identified" that would meet the Project's needs. FEIS, App. P at 3-108. The FEIS further claims that alternative sites, "including sites in Lake County" were reviewed based on certain screening criteria, but none

of the sites were found to be economically or technically feasible. FEIS, App. P at 3-7 to 3-8.

219.    However, the FEIS fails to provide adequate support for this supposed lack of feasibility. For example, the FEIS states that no other location is feasible because Koi does not and cannot own "an off-site property that would be suitable." FEIS, App. P at 3-8. Yet the FEIS provides no support for the incredible contention that Koi and its financial backers, who have demonstrated the financial ability to buy large sites, cannot purchase any eligible sites in other geographical locations.

220.    Moreover, the FEIS claims that Koi submitted "substantial evidence" regarding its "lengthy and thorough evaluation of alternative sites," yet does not provide this evidence or disclose the criteria that Koi utilized. FEIS, App. P at 3-8.

221.    The FEIS's claim that "no other available sites have been identified" that meet the Project's needs stretches credulity and falls short of the rigorous evaluation of geographic alternatives that NEPA requires. The stated purpose and need of the Project is to "facilitate tribal self-sufficiency, self-determination, and economic development." FEIS at 1.2. This purpose and need can be achieved in any number of geographic locations.

222.    Defendants' failure to adequately consider locations outside of the Project Site was arbitrary and capricious and an abuse of discretion.

Failure to Consider Impacts to Water Resources

*Speculative, Unenforceable, and/or Inadequate BMPs*

223.    The FEIS's analysis fails to adequately account for impacts to surface and groundwater resources to the extent that it relies on speculative, unenforceable, or inadequate BMPs.

224.    The FEIS claims that "[w]ith adherence to the [National Pollutant Discharge

Elimination System (NPDES)] permitting program and implementation of the [Stormwater Pollution Prevention Plan (SWPPP)]," any impact to surface water would be "less than significant." FEIS at 3-18. However, Koi has not yet obtained coverage under the NPDES General Construction Permit, nor has it prepared the requisite SWPPP.

225.    Defendants cannot rely on Koi's hypothetical, future coverage under the NPDES permitting program to conclude that the impacts to surface water will be "less than significant."

226.    Likewise, Defendants have not (and cannot) evaluate Koi's theoretical SWPPP in order to confirm its adequacy to render the impact on surface water "less than significant," as the SWPPP does not yet exist.

227.    In order to reach a valid conclusion regarding the impact of the Project on surface water supplies, Defendants must: (i) require Koi to prepare the requisite SWPPP, and (ii) conduct an environmental review of the SWPPP. The FEIS's reliance on speculative future actions and Koi's promises is insufficient under NEPA. *See, e.g.*, *Friends of Animals v. U.S. Fish & Wildlife Svc.*, 28 F.4th 19, 34 (9th Cir. 2022).

228.    The FEIS further claims that impact to surface water would be diminished because "[s]tormwater treatment and detention would be provided by bioswales, a detention basin, and/or the wastewater treatment plant," and because of the "weekly sweeping of internal roadways and parking areas to reduce sediment and debris from entering the stormwater drainage system." FEIS at 3-19.

229.    Critically, however, the FEIS *does not require Koi to route all stormwater to the wastewater treatment plant.* Nor does the FEIS require Koi to obtain an NPDES permit or implement SWPPPs (beyond construction of the Project Site) for any water discharges from the Project Site that do not come from the stormwater treatment plant.

230.    Accordingly, the FEIS provides no means to ensure that discharge from sources other than the stormwater treatment plant meets water quality standards, nor does it assess or account for the impact of such water discharge. Such water discharge places Pruitt Creek—which runs directly through the Project Site and ultimately joins with Windsor Creek, the Laguna de Santa Rosa, and the Russian River—at risk of contamination. The FEIS's failure to consider and address this risk of contamination renders its analysis of the impact on surface water deficient.

231.    Additionally, the FEIS's grading and drainage plan is deficient to the extent that it is modeled on storm events that do not match current weather trends. The plan assumes a 100-year, 24-hour storm event, but climate change has resulted in such storm events becoming more frequent.

232.    Finally, the FEIS's groundwater assessments are deficient because they do not meaningfully account for the impact of the Lytton Homeland Housing on groundwater drawdown concerns.

233.    The Supplemental Groundwater Resource Impact Assessment fails to consider the approximately 150 new families and structures in the Lytton Homeland Housing and their use of groundwater wells for community water supply. *See* FEIS, Appendix D-4.

234.    The Lytton Homeland Housing, located approximately three (3) miles from the proposed Project Site, which was not included in the FEIS, constitutes a "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1509(c)(1)(ii). Accordingly, under NEPA, Defendants were required to issue a supplemental FEIS that addressed the new housing development. *Id.*

235.    Defendants' failure to issue a supplemental FEIS to address the impact of Koi's proposed casino project on the Lytton Homeland Housing and the significant impact on water

resources, or to otherwise account for the Lytton Homeland Housing in its water resource analyses, further illustrates that the FEIS's analysis of the Project's impact on groundwater is insufficient under NEPA.

<u>Reliance on Inadequate Baseline Data</u>

236.    Despite concluding that the impacts to water resources would be less than significant, the FEIS does not include, nor have Defendants considered, any adequate water quality assessment of current conditions, benthic data, or comprehensive field data of nearby receiving waters or wetlands.

237.    On information and belief, Defendants have not collected or reviewed reliable water quality data on receiving waters near the Project Site.

238.    Indeed, the FEIS's Water and Wastewater Feasibility Study—which was conducted in February 2023—notes: "In order to begin detailed discussions . . . on the feasibility of discharging to the Pruitt Creek, *the Project would need to begin to collect receiving water quality data*." FEIS, App. D-1 at 4-4 (emphasis added).

239.    The FEIS's Aquatic Resources Delineation Report (FEIS, App. G-4, at 11-15) does not provide the necessary water quality data to reach a valid determination regarding the impact on water resources. This is because the water survey summarized in this report was conducted nearly three years ago in February 2022, only accounted for plant species and soil in surface waters and wetlands in the immediate vicinity of the Project Site, and did not consider other benthic data, such as the presence of macroinvertebrates or other aquatic ecosystems, or the quality of nearby surface waters or wetlands offsite. *Id*. Indeed, the Water and Feasibility Study referenced above acknowledged the inadequacy of this data when it noted that the Project had not yet "collect[ed] receiving water quality data." FEIS, App. D-1 at 4-4.

240.    Further, the FEIS's proposal that, as part of suggested mitigation measures, Koi collect baseline data *in the future* regarding groundwater levels and stream discharges is insufficient to support Defendants' *present* determination regarding impact on water sources. *See N. Plains Res. Council*, 668 F.3d at 1084-85 ("Because the [FEIS] does not provide baseline data for many of the species, and instead plans to conduct surveys and studies as part of its post-approval mitigation measures, we hold that the Board did not take a sufficiently 'hard look' to fulfill its NEPA-imposed obligations at the impacts to these species prior to issuing its decision.").

241.    Defendants' failure to obtain and consider critical baseline data on nearby receiving waters means that it has failed to take a "hard look" at the direct, indirect, or cumulative effects of the Project on water resources, in violation of NEPA's requirements.

<u>Failure to Consider Impacts to Wildlife Resources</u>

242.    The FEIS's analysis fails to adequately account for impacts to wildlife resources to the extent that it relies on speculative, unenforceable, or inadequate BMPs and mitigation measures.

243.    In concluding that the impact to wildlife resources and certain identified species would be "less than significant," the FEIS notes at several points that the Koi will comply with the NPDES General Construction Permit and SWPPPs. *E.g.,* FEIS at 3-52-54, 4-7-9. However, as noted, Koi has not yet obtained an NPDES permit, nor has it prepared the required SWPPP.

244.    Defendants cannot rely on Koi's hypothetical, future coverage under the NPDES permitting program to conclude that the impacts to wildlife resources will be "less than significant."

245.    Likewise, Defendants have not (and cannot) evaluate Koi's theoretical SWPPP in order to confirm its adequacy to render the impact on wildlife resources "less than significant," as

the SWPPP does not yet exist.

246.    In order to reach a valid conclusion regarding the impact of the Project on wildlife resources, Defendants must: (i) require Koi to prepare the requisite SWPPP, and (ii) conduct an environmental review of the SWPPP. The FEIS's reliance on speculative future actions and Koi's promises is insufficient under NEPA. *See Friends*, 28 F.4th at 34.

247.    Moreover, Defendants did not collect adequate baseline conditions regarding the Project Site and its wildlife resources, including baseline data regarding water resources (as discussed above).

248.    Defendants' failure to obtain and consider critical baseline data on wildlife conditions and resources means that they have failed to take a "hard look" at the direct, indirect, or cumulative effects of the Project on wildlife resources, in violation of NEPA's requirements.

<u>Failure to Consider and Address Economic Impact on Tribes Located in Sonoma County</u>

249.    In comments to the DEIS, Lytton and Dry Creek explained that the DEIS's economic impact studies were outdated and inaccurate because they failed to account for the presumed opening of the Scotts Valley Casino in Sonoma County. FEIS, App. B-5 at 5; App. P at T7. Defendants—recognizing that their previous economic analysis was indeed insufficient—supplemented their previous analysis with an "additional gravity model scenario analysis that now assumed the opening of both Scott's [sic] Valley and the Koi casino." FEIS, App. B-5 at 5. This analysis provides an estimated percentage of market substitution effects on nearby tribal casinos. *Id.* at 7.

250.    However, the supplemental economic impact analysis contained in the FEIS is *still* insufficient because it fails to address or consider the Project's cumulative economic effects on tribes located in Sonoma County. The FEIS does not provide any analysis of the actual impact or

intensity of the effects on Plaintiffs' members residing in the area, such as socioeconomic effects or loss of casino employees. The FEIS acknowledges that the River Rock Casino, which Dry Creek depends on to fund its tribal government and provide basic services to its citizens, faces a *40% decrease* in revenue due to the Project and the opening of the Scotts Valley casino. FEIS, App. B-5 at 5. Yet it does not analyze or address the potentially significant harm to Dry Creek and its members that might result from such a drastic revenue decrease. Nor does the FEIS provide an analysis of "the intensity of effects" and the "degree to which the action may adversely affects right of Tribal Nations that have been reserved through treaties, statutes, or Executive Orders," as required under 40 C.F.R. § 1501.3. The FEIS also fails to consider potential socioeconomic impacts to Cloverdale, which seeks to eventually begin its own gaming facility on its aboriginal lands to bring much-needed revenues to support its members.

251.    The FEIS claims that this analysis was not possible in part because of a lack of "access to the confidential and proprietary business information related to operation of the River Rock Casino, or the financial status of [Dry Creek]." FEIS at 3-104. However, as discussed above, Defendants have not engaged in adequate consultation with Dry Creek or other Plaintiffs or otherwise taken steps to obtain the information necessary to fulfill their duties under NEPA.

252.    Moreover, the FEIS concluded that there was a potentially significant socioeconomic impact on Dry Creek due to expected impacts of the Project on revenues for the River Rock Casino. The FEIS further concluded that this impact could not be mitigated. Defendants approved the Project, anyway—and reached that conclusion only after failing to appropriately consult with Dry Creek, as explained above.

253.    The FEIS's failure to assign sufficient weight to the Project's economic impact on tribes located in Sonoma County means that Defendants' supplemental economic impact analysis

does not take a "hard look" at the economic impacts of the Project, as NEPA requires.

## COUNT VII

### (Violation of IRA –
### Violation of IRA Privileges & Immunities Clause)

254.    Plaintiffs reallege and incorporate each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

255.    Plaintiffs bring this cause of action under the IRA and the APA to invalidate, void, and reverse the fee-to-trust transfer for the Project Site and invalidate and void the FEIS and ROD based upon Defendants' violation of the IRA Privileges & Immunities Clause.

256.    The IRA Privileges & Immunities Clause, 25 U.S.C. § 5123(f), guarantees that federal agencies will not "promulgate any regulation or make any decision or determination" pursuant to the IRA or other federal law "with respect to a federally recognized Indian tribe that classifies, enhances, or diminishes the privileges and immunities available to the Indian tribe relative to other federally recognized tribes by virtue of their status as Indian Tribes."

257.    The IRA also provides that "[a]ny regulation or administrative decision or determination of a department or agency of the United States that is in existence or effect on May 31, 1994, and that classifies, enhances, or diminishes the privileges and immunities available to a federally recognized Indian tribe relative to the privileges and immunities available to other federally recognized tribes by virtue of their status as Indian tribes shall have no force or effect." 25 U.S.C. § 5123(g).

258.    A tribe's ability to conduct gaming activities on off-reservation lands under the restored land exception is a "privilege" available to it by virtue of its status as a federally recognized Indian Tribe.

259.    Plaintiffs Lytton and Cloverdale are similarly situated to Koi. All three tribes are

located in California. Those tribes' recognition status was "terminated" but later "restored," and those tribes are currently recognized by DOI. However, Lytton and Cloverdale, as compared to Koi, experienced disparate treatment by BIA, in violation of the IRA.

260.    For instance, after fighting to obtain a restoration of its status as a federally recognized tribe in the *Scotts Valley* litigation,[18] Lytton applied for a restored lands determination in 1999. DOI rejected that application, not because Lytton lacked a significant historical connection to the land, but because DOI had a policy at the time of denying all restored land petitions unless there was legislation specifying that a tribe was entitled to certain lands.

261.    As such, Lytton had to fight tooth and nail to obtain legislation specifying its entitlement to land to be taken into trust, which it eventually did. Even after this victory, however, Lytton had to execute agreements with the City of San Pablo and jump through numerous other hoops to set up its gaming facilities.

262.    The process for Lytton to obtain a declaration for land held in trust by the United States took enormous efforts, including massive expenditures to support litigation and lobbying efforts. Similarly, the process for Dry Creek and Cloverdale to obtain their approvals for gaming on land taken into trust has taken a multi-decade effort—even though Dry Creek's and Cloverdale's aboriginal lands (unlike Koi's) are located in Sonoma County. In fact, Cloverdale has yet to open its gaming facility or have any lands placed into trust, despite significant effort and resources being used to do so.

263.    In 2008, DOI adopted a policy of granting petitions for restored lands based on whether the tribe had a "significant historical connection" to the land. 25 C.F.R. § 292.12. This

---

[18]    *See Scotts Valley Band of Pomo Indians of the Sugar Bowl Rancheria v. United States*, No. 86–3660 (N.D. Cal. Mar. 22, 1991) (stipulating entry of judgment).

policy made it easier for tribes to obtain a restored lands determinations, but some Tribes still had their applications denied due to an inability to meet this criteria.

264.    As explained above, Koi's application for a restored lands determination does not meet this criteria. Nonetheless, on January 13, 2025, Defendants rushed to approve Koi's restored lands exception application. Defendants made this decision despite the fact that Koi is located dozens of miles away from the Project Site and, unlike Plaintiffs, lacks any significant historical connection to this land. This conduct exhibits a clear bias and special treatment in favor of Koi and at Plaintiffs' expense.

265.    Defendants' decision to approve Koi's application in this manner violates the IRA Privileges & Immunities Clause, as it enhances the gaming privileges of Koi relative to Lytton and Cloverdale.

266.    In approving Koi's application, Defendants essentially enacted a new rule for determining eligibility under the restored lands exception—without applying the correct processes to create a new rule, justifying the change, or notifying relevant parties of the change.

267.    Under this new approach, Defendants would allow California tribes to take land into trust where they do not have ancestral or historical ties.

268.    For example, and as discussed above, Defendants found contrary to their own rules and prior ILOs that Koi had a "significant historical connection" to the Project Site because of the alleged existence of aboriginal trade routes. In doing so, Defendants violated the IRA Privileges & Immunities Clause, as they set out a "new legal test" and failed to "apply the same legal rule in the same manner." *Native Village of Eklutna v. United States Dept. of the Interior, et. al, & State of Alaska, Defendant-Intervenor*, 2021 WL 4306110, at *7 (D.D.C. Sept. 22, 2021).

269.    In addition, Defendants violated the IRA Privileges & Immunities Clause in the

manner they reviewed the evidence of various tribes in support of and against the Koi application.

270.    For example, notwithstanding the court's statement in its reconsideration ruling of *Scotts Valley Band of Pomo Indians v. United States Dep't of the Interior*, 633 F. Supp. 3d 132, 140 (D.D.C. 2022), that it "didn't rule that [DOI] had to apply the [Indian] can[]on" in any Indian land opinions, Defendants confirmed that they would apply the Indian canon of construction to evidence provided by Koi—but not to any evidence provided by non-applicant tribes.

271.    Similarly, while Defendants acknowledged in the Koi ILO that they would consider Koi's evidence in view of the IGRA's "overall goal of promoting economic development," Koi ILO at 14, they stated in a meeting with Plaintiffs that they would not consider the economic impact of approving the application on the tribes that would be harmed by the decision.

272.    In doing so, Defendants confirmed that economic harms to Dry Creek, Cloverdale, and Graton—with over 3,000 tribal members, collectively, compared to Koi's membership of less than 90 individuals—would be irrelevant to the restored lands analysis.

273.    This disparate treatment of evidence by different tribes enhances the privileges accorded to Koi and diminishes those available to Plaintiffs.

274.    And to the extent Defendants implemented a new, more lenient policy to establish the restored lands exception, that policy "diminish[es] the privileges and immunities available to" Plaintiffs relative to Koi and should not be given force and effect.

275.    Finally, Defendants violated the IRA Privileges & Immunities Clause by setting out new tests regarding approval of Koi's environmental applications.

276.    For example, by assigning enforcement to the NIGC, Defendants have put forth a wholly new approach for enforcing environmental standards with respect to Koi's petition for the Project Site.

277.    Thus, to the extent Defendants implemented a new test or policy with respect to Koi's environmental approvals (as well as in the Koi ILO), such policies diminish the privileges and immunities available to Plaintiffs relative to Koi and should not be given force and effect.

## COUNT VIII

### (Violation of the APA –
### Preferential Treatment)

278.    Plaintiffs reallege and incorporate each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

279.    Plaintiffs bring this cause of action under the APA to invalidate, void, and reverse the fee-to-trust transfer for the Project Site and invalidate and void the FEIS and ROD based upon Defendants' preferential treatment of Koi.

280.    "A fundamental norm of administrative procedure requires an agency to treat like cases alike. If the agency makes an exception in one case, then it must either make an exception in a similar case or point to a relevant distinction between the two cases." *Westar Energy, Inc. v. FERC*, 473 F.3d 1239, 1241 (D.C. Cir. 2007).

281.    According to DOI, Plaintiffs are similarly situated to Koi. Plaintiffs are located in California. Lytton's and Cloverdale's recognition status was "terminated" and subsequently "restored." Plaintiffs are all currently recognized as tribes by DOI.

282.    As discussed above, however, Defendants approved Koi's application under the restored lands exception despite Koi (1) failing to show that it had any significant historical connection to the land and (2) failing to provide legislative authority for the approval.

283.    Specifically, Defendants deviated from past practice by emphasizing factors previously considered insufficient or irrelevant to show a "significant historical connection," such as trade routes used by the Koi, or the (universal) "context of [] violence and disregard for Indian

life." Koi ILO at 19. And it did so despite Koi's own acknowledgment that its aboriginal territory is in Lake County, not Sonoma County, including in its lawsuits against the City of Clearlake.

284.    In addition, Defendants used their authority under 25 C.F.R. Section 1.2 to waive regulations twice related to the Project Site, without providing a sufficient explanation as to why they did so.

285.    And Defendants conducted a streamlined and expedited review of the requisite environmental assessments, which review lacked meaningful consultation with local impacted tribes.

286.    Defendants' preferential treatment of Koi's application was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the law in violation of the APA. At the very least, Defendants were required to explain the agency's preferential treatment of Koi relative to Plaintiffs, which they refused to do because, *inter alia*, there was a conflict of interest.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully requests that the Court enter a judgment:

A.    Declaring that:

   i.    The FEIS, ROD, and Koi ILO are invalid and void, and that the fee-to-trust transfer was not lawfully effectuated and thus is also invalid and void; and

   ii.    To the extent the Court finds that the FEIS, ROD, and Koi ILO were not void, that Defendants acted arbitrarily and capriciously, abused their discretion, or otherwise acted contrary to law, by issuing the FEIS, ROD, and Koi ILO, and approving the fee-to-trust transfer; and

B.    Ordering that the FEIS, ROD, and Koi ILO be vacated and that the fee-to-trust transfer be reversed;

C.      Issuing mandamus pursuant to 25 U.S.C. § 1651 to compel the Secretary to immediately remove the Project Site from trust;

D.      Issuing preliminary and permanent injunctive relief and any other orders necessary to preserve the parties' rights and status pending conclusion of the review proceedings, to reverse the fee-to-trust transfer, and to require the Defendants to conduct new reviews of the Project and fee-to-trust transfer;

E.      Awarding Plaintiffs their costs and litigation expenses, including attorneys' fees and costs; and

F.      Awarding Plaintiffs such other and further relief as the Court deems just, proper, and equitable.

Dated: February 21, 2025                    MAYER BROWN LLP


By: */s/ Andrew J. Pincus*
    Andrew J. Pincus
    *apincus@mayerbrown.com*
    1999 K Street, NW
    Washington, DC 20006-1101
    Telephone: (202) 263-3000

    Daniel D. Queen(*pro hac vice to be submitted*)
    *dqueen@mayerbrown.com*
    Carter M. Jansen (*pro hac vice to be submitted*)
    *cjansen@mayerbrown.com*
    333 South Grand Avenue, 47th Floor
    Los Angeles, CA 90071
    Telephone:  (213) 229-9500
    Facsimile:  (213) 625-0248

    *Counsel for Plaintiffs Lytton Rancheria of California; Dry Creek Rancheria Band of Pomo Indians, California; and Cloverdale Rancheria of Pomo Indians of California*